THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EUGENE RUDDY and REBECCA          :
RUDDY, husband and wife, individually  :
and as parents of S.R., a minor,          :
                                          :
                                          :
          Plaintiffs,                     :
                                          :
     v.                                   :     3:17-CV-0423
                                          :     (JUDGE MARIANI)
POLARIS INDUSTRIES, INC. et al.,          :
                                          :
          Defendants.                     :

FILED
SCRANTON

MAR 0 3 2022

Per_____

DEPUTY CLERK

## MEMORANDUM OPINION

### I. INTRODUCTION

On March 7, 2017, Plaintiffs Eugene Ruddy and Rebecca Ruddy, husband and wife,

individually and as parents of S.R., a minor, filed a Complaint (Doc. 1) against multiple

defendants, including Polaris Industries, Inc. and Polaris Sales, Inc.  Collectively, Plaintiffs

assert six claims against Defendants in their Fourth Amended Complaint (Doc. 69):

negligence (Count I); strict liability (Count II); breach of warranty (Count III); gross

negligence, recklessness, malice (Count IV); loss of consortium (Count V); and negligent

infliction of emotional distress (Count VI).  Presently before the Court is a Motion for

Summary Judgment (Doc. 172) filed by Polaris Industries, Inc. and Polaris Sales, Inc.

(collectively, "Polaris").

Polaris has submitted a Statement of Material Facts (Doc. 174) as to which they

submit there is no genuine issue or dispute of material fact for trial, as well as a Brief in

Support of their Motion to Dismiss (Doc. 173). Plaintiffs submitted a Counterstatement of

Material Facts and Response to the Motion for Summary Judgment of Polaris (Doc. 184)

and a Brief in Opposition to Polaris' Motion for Summary Judgment (Doc. 185). Polaris also

submitted a Reply Brief to Plaintiffs' Brief in Opposition (Doc. 198).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "only where there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549

F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary

basis on which a reasonable jury could find for the non-moving party, and a factual dispute

is material only if it might affect the outcome of the suit under governing law." *Kaucher v.*

*County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of

those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P.

56(a).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.

3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary

judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

3

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson,* 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## III. ANALYSIS

Plaintiffs assert a total of six claims against Defendants in their Fourth Amended Complaint ("Complaint") (Doc. 69): negligence (Count I); strict liability (Count II); breach of warranty (Count III)[1]; gross negligence, recklessness, malice (Count IV); loss of consortium (Count V); and negligent infliction of emotional distress (Count VI). Polaris argues for summary judgment on all claims asserted against it.

Polaris also argues that summary judgment is appropriate on Plaintiffs' intentional infliction of emotional distress claim. (Doc. 172 at 6-7; Doc. 173 at 21-23). Plaintiffs, however, do not assert an intentional infliction of emotional distress claim in their Complaint;

---

[1] Although Polaris moves for summary judgment on all claims asserted against it, Polaris has failed to present an argument as to why Plaintiffs' claim for breach of warranty should be subject to summary judgment. However, that precise claim has been asserted by the Moore Company and Moeller Marine in their Motion for Summary Judgment (Doc. 169; Doc. 171) and is addressed in the Court's Opinion on their Motion for Summary Judgment. There, the Court ruled that Plaintiffs failed to raise a genuine dispute of material fact regarding the arguable existence of an express warranty, and thus granted summary judgment on that claim. Additionally, the Court ruled that the applicable four-year statute of limitations (*see* 13 Pa. C.S.A. 2725) barred Plaintiffs' breach of implied warranty of merchantability and fitness claims from proceeding past the summary judgment stage, and the Court granted Moore and Moeller's motion for summary judgment on those claims as well. Since Plaintiffs' breach of warranty claims may not go forward in Moore and Moeller's Motion for Summary Judgment, it follows that summary judgment must be entered in favor of Polaris on Plaintiffs' claim for breach of warranty as well.

4

instead, Plaintiffs assert negligent infliction of emotional distress. (Doc. 69 at ¶¶ 99-105). Accordingly, Polaris' argument for summary judgment on Plaintiffs' non-existent intentional infliction of emotional distress claim is moot and thus will not be addressed by the Court.

## A. Choice of Law

Polaris argues that this case involves a choice of law analysis between Florida and Pennsylvania, and Florida law should apply. Polaris argues that "[t]here is an actual conflict between Pennsylvania and Florida law, yet it is a 'false' conflict that requires application of Florida's statute of repose to abolish Plaintiffs' claims." (Doc. 172 at ¶ 3). Polaris argues in the alternative that "[i]n the event that the Court determines there to be a true conflict such that the exercise of considering contacts the Ruddy family and the Subject PWC had with both Pennsylvania and Florida, relative to the strict liability claims asserted, then Florida law still applies." (Doc. 173 at 15). In response, Plaintiffs argue that the "divergence" in Pennsylvania and Florida law is a false conflict "in that only Pennsylvania's interests would be impaired if Florida's statute of repose is applied." (Doc. 185 at 8).

Federal courts sitting in diversity are required to apply the choice of law rules of the state in which they sit. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226 (3d Cir. 2007). In Pennsylvania, courts apply "a flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Id.* at 227; *Wilson v. Transport Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. Ct. 2005) ("Under the flexible conflict methodology approach to insurance contract cases, which was set forth by our Supreme Court in *Griffith*

*v. United Airlines, Inc.*, 461 Pa. 1, 203 A.2d 796 (1964), the court must apply the law of the state having the most significant contacts or relationships to the contract and not the underlying tort."). Using this approach, "Pennsylvania courts are to apply the law of the forum with the 'most interest in the problem,' rather than the law of the place of injury." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 227 (3d Cir. 2007) (quoting *Griffith v. United Air Lines Inc.*, 203 A.2d 796, 806 (Pa. 1964)).

Pennsylvania's choice of law analysis is a three-step process. First, the district court determines whether there is "an actual or real conflict between the potentially applicable laws." *Hammersmith*, 480 F.3d at 230. "If there are relevant differences between the laws, then the court should examine the governmental policies underlying each law, and classify each conflict as a "true," false," or an "unprovided-for" situation." *Hammersmith*, 480 F.3d at 230; *see also Powers v. Lycoming Engines*, 328 F. App'x 121, 125 (3d Cir. 2009). If the interests of both jurisdictions would be undermined by the application of the other's laws, there is a "true conflict" and "a deeper choice of law analysis is necessary." *Hammersmith*, 480 F.3d at 230 (citations and quotations omitted). If there is no conflict between the jurisdictions' laws, a choice of law analysis is unnecessary. *Id.*; *see also Oneida Plaza, LLC v. Ohio Security Ins. Co.*, 2022 WL 254571, at *4 (E.D.Pa. Jan. 27, 2022) ("If there is no conflict and the law in both jurisdictions is the same, then there is no need to proceed with the choice of law analysis.").

6

Polaris identifies a "conflict" between Florida's statute of repose, which bars products liability actions filed more than twelve years after the product was first sold (unless an exception applies), *see* Fla. Stat. Ann. § 95.031(b), and Pennsylvania law, which does not have an applicable statute of repose for products liability actions. (Doc. 173 at 9). This divergence would permit the case to proceed under Pennsylvania law, but not under Florida law. Pennsylvania and Florida law conflict "in a material and potentially dispositive way," so the Court "must query whether both states have an interest in the application of their conflicting laws." *Sikkelee v. Precision Airmotive, Corp.*, 2012 WL 12862562, at *3 (M.D.Pa. March 13, 2012).

According to Polaris, the differences in Pennsylvania and Florida law is a "false conflict." (Doc. 173 at 13). Polaris contends that "Pennsylvania has no interest that would be impaired if Florida law were applied here," but Florida's policy of limiting "the time period within which a consumer may assert strict liability claims against a product manufacturer" would be impaired if Pennsylvania law were applied. (*Id.*). Because Pennsylvania law allegedly would not be impaired by application of Florida law, Polaris argues, this is a "false conflict" and the Court should apply Florida's statute of repose to bar Plaintiffs' claims. (*Id.* at 13-15). Plaintiffs agree that there is a false conflict, but argue the conflict exists because "*only* Pennsylvania's interests would be impaired if Florida's statute of repose is applied, whereas Florida's interests would not be impacted if the lawsuit proceeds." (Doc. 185 at 8).

7

Polaris argues that "[t]he duty in strict liability in Pennsylvania pertains to the duty of a manufacturer and of suppliers in the chain of distribution to the ultimate consumer" and Pennsylvania law "does not take a position as to whether a manufacturer of a defective product may be strictly liable to the general public (*i.e.*, one who is neither a user nor a consumer)." (Doc. 173 at 12 (internal citations omitted)).  Florida, however, "strongly supports a policy 'to balance rights of injured persons against exposure of defendants to liability for endless periods of time'" and has enacted the statute of repose in accordance with this policy, as argued by Polaris.  (*Id.* at 13).  Plaintiffs argue that Pennsylvania does, in fact, have strong interests in their claims because they are Pennsylvania residents, they "suffered catastrophic injuries in an incident that occurred in this Commonwealth," Pennsylvania-based media outlets covered the incident, and both Rebecca and Scott Ruddy "have received and will continue to receive costly inpatient and outpatient medical care in Pennsylvania."  (Doc. 185 at 9).  Additionally, according to Plaintiffs, "Pennsylvania's public school system has also been harmed by Defendants' defective PWC" because the school system has to provide ongoing support and specialized care for Scott Ruddy as a result of the injuries he sustained in the PWC explosion.  (*Id.* at 9-10).

Polaris' argument is wholly without merit, and Polaris has manufactured a conflict of law issue where there is none.  "Pennsylvania's laws are, in essence protecting its consumers and holding responsible its manufacturers.  The adoption of strict liability emphasizes this interest, and it is further highlighted by the courts and legislature declining

to adopt a statute of repose." *Sikkelee*, 2012 WL 12862562, at *4.  Polaris argues that

Pennsylvania has "no interest" in this case because Plaintiffs "'consumed' this PWC as

Florida, not Pennsylvania, residents" since they purchased the PWC before they became

Pennsylvania residents.  (Doc. 173 at 12-13; Doc. 198 at 2).  This argument fails for a

number of reasons.  Plaintiffs are users of the PWC.  Section 402A of the Restatement

(Second) of Torts applies to "one who sells any product in a defective condition

unreasonably dangerous to the *user or consumer . . .*"  (Restatement (Second) § 402A(1)

(emphasis added)).  Plaintiffs are better characterized as users of the PWC and not, as

Polaris argues, consumers.  Plaintiffs used the PWC in multiple places, including Florida,

California, and Pennsylvania, and they were using the PWC in Pennsylvania when the

subject explosion occurred.  (Eugene Ruddy Dep. Tr., Doc. 172-6, Ex. E at 81:17-82:3).

Pennsylvania has an interest in protecting both users and consumers of defective products

within its borders, and Plaintiffs are undeniably considered users of the PWC within the

Commonwealth.  *See Sikkelee*, 2012 WL 12862562, at *4 ("Pennsylvania's interests are, in

essence, protecting its consumers and holding responsible its manufacturers.").

Additionally, Plaintiff argues that Pennsylvania has an interest in this case because

they have received and will continue to receive medical care in the state and Scott Ruddy

needs personalized care at school in the form of a specialized curriculum and having an

aide with him at all times while attending Pennsylvania public schools.  (Doc. 185 at 9-10).

In contrast, Florida's interests in having a statute of repose to bar products liability claims

after twelve years would not be impaired if this Court applies Pennsylvania law. Both parties agree that Florida's interests in having a statute of repose are to "reduce the case load of the courts by restricting certain actions," "attract more business investment in Florida," "enhance the success and growth of small business in Florida," "discourage frivolous litigation," "enhance Florida's ability to attract a better manufacturing base," and "enhance the affordability of goods and services for all Floridians." (Doc. 185 at 13; Doc. 198 at 3-4). None of the identified interests are impacted by applying Pennsylvania law to an incident that occurred in Pennsylvania and to Pennsylvania residents. The case is not on a Florida court docket, so there is no concern over the impact this case will have on the case load of Florida courts, and Polaris is not a Florida manufacturer, so the business interests are not impacted, either. (Doc. 69 at ¶¶ 5-6 (noting that Polaris has its principal place of business in Minnesota and "is a corporation or other jural entity and existing under the laws of Minnesota")); *see also Sikkelee*, 2012 WL 12862562 at *4 ("Our concern is that neither North Carolina's interest in protecting its courts nor its interest in protecting its industry are implicated by a North Carolina plane crash, a subsequent civil suit in Pennsylvania federal court, arising from a Pennsylvania company's allegedly defective manufacture of a product. Indeed, no North Carolina manufacturer or court is involved, and thus the two interests aimed to be protected by these laws are not triggered on these facts."). There are no Florida citizens or manufacturers involved in this case, nor did the

subject explosion occur in Florida.  Florida has no colorable interest that would be impaired if this Court applies Pennsylvania law.

In sum, applying Florida's statute of repose would significantly impair Pennsylvania's interests in protecting users of allegedly defective products and protecting its residents more generally, but application of Pennsylvania's strict liability law will not impair the interests of Florida.  Thus, the conflict recognized by Polaris in their Motion for Summary Judgment is a false conflict because "only one state would be impaired by application of another's state law."  *See Sikkelee*, 2012 WL 12862562, at *4.  When presented with a false conflict, "the court need not entertain a conflicts of law analysis." *Id.* at *2.  Accordingly, Pennsylvania's strict liability law applies, and Plaintiffs' case is not barred by Florida's statute of repose.

### B. Whether Plaintiffs' PWC Was Defective

Polaris next argues that "[n]ot only have Plaintiffs failed to meet their burden of submitting evidence that the condition of the fuel hoses, which are alleged to have shrunk over time, were in the same or substantially similar condition at the time of the accident as they were at the time the unit was sold, there is uncontradicted evidence to the contrary." (Doc. 173 at 17).  Polaris claims that because there is "unrefuted evidence" that the fuel pump in Plaintiffs' PWC was replaced in 2005, there was maintenance work done on the PWC before Plaintiffs purchased it, and because "Plaintiffs offer no evidence whatsoever about the service and maintenance history on the subject PWC for a period of 8 years," Plaintiffs have not met their burden to establish that the fuel hoses were in the same or a

11

substantially similar condition as they were when the PWC was manufactured and originally sold. (*Id.* at 16-17). Plaintiffs argue that they have "proffered substantial evidence demonstrating that the PWC was defective as manufactured and designed, and any alleged modifications to the PWC would not constitute a superseding cause of injury." (Doc. 185 at 17).

Pennsylvania law on the doctrine of products liability governs in a diversity action. *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 113 (3d Cir. 1992). The Supreme Court of Pennsylvania has adopted Section 402A of the Restatement (Second) of Torts. *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 359 (Pa. 2014) (citing *Webb v. Zern*, 220 A.2d 853 (Pa. 1966)). Section 402A provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or the consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>> a. The seller is engaged in the business of selling such product, and
>> b. It is expected to and does reach the consumer without substantial change in the condition in which it is sold.
> (2) The rule stated in Subsection (1) applies although
>> a. The seller has exercised all possible care in the preparation and sale of his product, and
>> b. The user or consumer has not bought the product from or entered into any contractual relation with the seller.

To prevail on a strict liability claim, the plaintiff must prove that the product was defective due to a manufacturing, design, or failure-to-warn defect, that the defect existed when it left the defendant's hands, and that the product's defect caused the alleged harm. *Igwe v.*

12

*Skaggs*, 258 F.Supp.3d 596, 609 (W.D.Pa. 2017) (*citing High v. Pa. Supply, Inc.*, 154 A.3d 341, 345-46 (Pa. Super. 2017)).

"[A] plaintiff pursuing a cause upon a theory of strict liability in tort must prove that the product is in a 'defective condition'" by demonstrating "either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer, or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." *Tincher*, 104 A.3d at 335. The *Tincher* Court held that the issue of

> [w]hether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue. Thus, the trial court is relegated to its traditional role of determining issues of law, *e.g.*, on dispositive motions, and articulating the law for the jury, premised upon the governing legal theory, the facts adduced at trial and relevant advocacy by the parties.

*Id. Tincher* further explained that trial courts "do not necessarily have the expertise to conduct the social policy inquiry into the risks and utilities of a plethora of products and to decide as a matter of law, whether a product is unreasonably dangerous except perhaps in the most obvious cases." *Id.* at 380; *see also Lewis v. Lycoming*, 2015 WL 3444220, at *4 (E.D.Pa. May 29, 2015) ("There is ample room in the present record for the jury to decide what balance of risk and utility or what consumer expectations are appropriate with respect to the fuel servo."). With respect to strict liability claims that implicate the risk-utility calculus, the *Tincher* Court reasoned that

13

when a plaintiff proceeds on a theory that implicates a risk-utility calculus, proof of risks and utilities are part of the burden to prove that the harm suffered was due to the defective condition of the product. The credibility of witnesses and testimony offered, the weight of evidence relevant to the risk-utility calculus, and whether a party has met the burden to prove the elements of the strict liability cause of action are issues for the finder of fact, whether the finder of fact is a judge or jury. A question of whether the party has met its burden of proof is properly 'removed' – for example, via adjudication of a dispositive motion – 'from the jury's consideration only where it is clear that reasonable minds [cannot] differ on the issue.' *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1284-85 (1978).

*Tincher*, 104 A.2d at 408.

Pennsylvania law is clear that the Court cannot resolve the questions of whether a product was defective and the cause of a particular incident, both of which are at issue in this case, unless "it is clear that reasonable minds could not differ on the issue." *Tincher*, 104, A.3d at 335; *see also Sikkelee v. Precision Automotive Corp.*, 907 F.3d 701, 716 (3d Cir. 2018). Here, Polaris' arguments regarding whether Plaintiffs' PWC and its component parts were defective at the time of manufacture and the cause of the explosion, including whether any alleged maintenance or repairs performed on Plaintiffs' PWC were superseding causes, are prime examples of issues that are inappropriate for the Court to determine on summary judgment.

Contrary to Polaris' arguments, there are significant genuine issues of material fact that remain. Polaris contends that Plaintiffs have not submitted evidence that shows that the fuel pump and fuel hoses were in the same or substantially similar condition at the time the PWC was originally manufactured because "[t]he totality of what is known for work

14

performed during the unit's life before Plaintiffs bought it strongly shows that the fuel system underwent major modification," including replacement of the fuel pump.  (Doc. 173 at 16-17; *see generally* Doc. 173-4, Ex. C).  However, Plaintiffs argue that "[t]he documents that Defendants generically cite to in their motion demonstrate only that the dealership performed some undetermined service to the fuel system" and the documents do not "establish that the original fuel system, including the fuel lines and fuel barbs, were replaced as new."  (Doc. 185 at 20-21).

In Pennsylvania, "[w]here the product has reached the user . . . with substantial change, the question becomes whether the manufacturer could have reasonably expected or foreseen such an alteration of its product." *Roudabush v. Rondo, Inc.*, 2017 WL 3912370, at *3 (W.D.Pa. Sept. 5, 2017) (quoting *Davis v. Berwind Corp.*, 640 A.2d 1289, 1297 (Pa. 1994).  "Foreseeability is a question for the factfinder unless the inferences are so clear that the court can say as a matter of law that a reasonable manufacturer could not have foreseen the change." *Davis*, 640 A.2d at 1297; *see also Gonzalez v. Thomas Built Buses, Inc.*, 934 F.Supp.2d 747, 754 (M.D.Pa. 2013).

Looking at Polaris' exhibit that documents the alleged maintenance or repair work performed on Plaintiffs' PWC, it is unclear what exactly was done and whether any component part of the PWC, including but not limited to the fuel pump assembly, was repaired and/or replaced.  (Doc. 173-4, Ex. C).  Furthermore, Plaintiffs submitted a report from one of their experts, David Cooke, P.E, who, upon inspection of Plaintiffs' PWC,

15

observed that "[t]he orientation of the fuel pump assembly was consistent with Polaris'

design." (Cooke Report, Doc. 184-8, Ex. F at 5). According to Plaintiffs, this indicates that

"even if the fuel system were replaced, it nonetheless remained in the same orientation and

per the same design at the time of the explosion as when it left Polaris' hands." (Doc. 185

at 21). Construing all facts in favor of Plaintiffs, as we must, the Court finds that there are

outstanding genuine issues of fact regarding (1) whether and how Plaintiffs' PWC was

changed after it underwent maintenance and/or repairs, as documented by Polaris' Exhibit

C, (2) whether any alleged modifications, repairs, or maintenance substantially changed

Plaintiffs' PWC so that it was not in the same or substantially similar condition as it was

when it was manufactured, and, more generally, (3) whether Plaintiffs' PWC was defective.

These questions must be resolved by a jury and thus, Polaris' Motion for Summary

Judgment on Plaintiffs' negligence claim and their claim for strict liability based on a design

defect and manufacturer's defect is denied.

Plaintiffs' Complaint also alleges a failure to warn defect. (Doc. 69 at ¶¶ 47, 81).

According to Polaris, summary judgment is appropriate because Plaintiffs "failed to heed the

clear warning of ensuring the absence of gasoline and fuel before starting the engine – a

risk they both recognized and understood." (Doc. 173 at 21).

Polaris points to a portion of Rebecca Ruddy's deposition to support its argument

where, in response to the question, "Did you understand that there was always a risk of fire,

explosion with any boat, including a PWC?," she generally agreed, saying "I think there is

with anything with fuel." (Rebecca Ruddy Dep. Tr., Doc. 172-8, Ex. G at 55:13-15; Doc. 173 at 19). Polaris further notes that Mrs. Ruddy read the warning labels on the PWC. (Doc. Doc. 172-8, Ex. G at 54:17-21). Polaris also references Eugene Ruddy's educational and career background before stating that he "admitted that the engine should not be started if gasoline or vapors are present" and that he "looked at every page of the Owner Manual." (Doc. 173 at 20).

The warning label affixed to Plaintiffs' PWC label contains two columns with the headings "WARNING" and "CAUTION." (Warning Label, Doc. 172-10, Ex. I, at 1). In the "WARNING" column, there is a statement that reads "Gasoline and its vapors are highly flammable and explosive" and then provides a bulleted list of what users should do "[t]o avoid fire or explosion." (*Id.*). The list includes actions such as "Pull up seat and open engine compartment before starting engine. Push down and latch compartment cover and replace seat before re-starting engine" and "Do not start engine if gasoline or vapors are present." (*Id.*). Because of this, Polaris argues, Plaintiffs "recognized and understood" the risks associated with starting the engine with gasoline or gasoline vapors present, but nevertheless "failed to heed the clear warning." (Doc. 173 at 21).

Polaris argues that "[t]he on-product label clearly and unambiguously states that the engine should not be started if gasoline or vapors are present" and compares this warning to a warning on a saw blade that stated "DON'T RUN THE MACHINE WITHOUT NECESSARY SAFEGUARDS." (Doc. 173 at 20); *see also Hatcher v. SCM Group North*

17

*America, Inc.*, 167 F.Supp.3d 719, 727 (E.D.Pa. 2016). The warnings on Plaintiffs' PWC, however, are different from the *Harrison* warnings. The court in Harrison reasoned that the saw blade warning "was sufficient to alert the operator that the machine was accompanied by safety guards" and the "warning called attention to the existence of the safety guards, and the manual explained in appropriate detail how to use each of them, including the blade guard." *Harrison*, 167 F.Supp.3d at 727. Here, neither the on-product warning label nor the Owner's Manual directed users, like Plaintiffs, to the existence of safety guards. To the contrary, the warnings on Plaintiffs' PWC consisted of actions the users themselves had to take to ensure the safety of the PWC, such as removing the seat to ensure that there are no gasoline vapors present. There is a difference between safety features already present on a product and actions that users must unilaterally undertake to ensure the safety of a product. It follows, then, that the content of warnings on each type of product would differ accordingly. As such, Polaris' comparison to the warning analyzed in *Harrison* falls flat in this case because the safety features and/or actions are categorically different.

Ruston Hunt, Ph.D., Plaintiffs' expert on human factors engineering, examined the warning label affixed to Plaintiffs' PWC and the Owner's Manual to determine whether, in his expert opinion, Polaris' warnings for the subject PWC were sufficient. Dr. Hunt concluded that both the on-product warning label and the Owner's Manual did not warn Plaintiffs of the dangers associated with using the PWC. (Hunt Report, Doc. 184-20, Ex. R at 23 ("The Gasoline Warning Decal on the Polaris PWC failed to communicate to the

18

Ruddys the need to remove the seat to inspect for gasoline vapors before every start of the engine.")). Dr. Hunt identified deficiencies in the Owner's Manual, as well. Dr. Hunt stated that the Owner's Manual for the Plaintiffs' PWC failed to communicate to Plaintiffs "the need to remove the seat to inspect for gasoline vapors before every start of the engine," "the actions they needed to take, as enumerated by Mr. Cory Knudston in his deposition, to avoid an explosion," and failed to communicate "the significant hazard associated with fugitive vapors in the engine compartment." (*Id.* at 23). Dr. Hunt also determined that "Polaris failed to properly warn and communicate that the fuel lines should be inspected and replaced on a periodic basis" and did not warn Plaintiffs of what to look for when examining the fuel barbs. (*Id.*). Finally, Dr. Hunt concluded that "[t]he product warning labels were inadequate and should have conveyed with appropriate signal words (in the correct location on the PWC near the ignition) the hazards and steps to avoid the risk for explosion." (*Id.* at 24).

Dr. Hunt's report raises material questions regarding the content of the on-product warning label near the gas tank, the location of the on-product label, the warnings, or the lack thereof, in both the on-product label and the Owner's Manual, and whether any alleged deficiencies in the on-product label and Owner's Manual created a failure to warn defect. Furthermore, as the Court mentioned above, "[w]hether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could

not differ on the issue." *Tincher*, 104 A.3d at 309.  Here, reasonable minds can surely differ

on the issue of whether Plaintiffs' PWC, manufactured by Polaris, contained a failure to

warn defect.  As such, the Court will deny Polaris' Motion for Summary Judgment on

Plaintiffs' claim for strict liability based on a failure to warn defect.

### C. Punitive Damages

In Pennsylvania, punitive damages "are awarded only for outrageous conduct, that

is, for acts done with a bad motive or with reckless indifference to the interests of others."

*SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 705 (Pa. 1991) (quoting *Chambers v.*

*Montgomery*, 411 Pa. 339, 192 A.2d 355, 358 (1963)).  As the Supreme Court of

Pennsylvania described,

> Punitive damages may be awarded for conduct that is outrageous, because of
> the defendant's evil motive or his reckless indifference to the rights of others.
> Punitive damages must be based on conduct which is "malicious," "wanton,"
> "reckless," "willful," or "oppressive."  Further, one must look to the act itself
> together with all the circumstances including the motive of the wrongdoers and
> the relations between the parties.  The state of mind of the actor is vital.  The
> act, or the failure to act, must be intentional, reckless, or malicious.  (internal
> citations omitted).

*Feld v. Merriam*, 506 Pa. 583, 485 A.2d 742, 747-48 (Pa. 1984); *see also Brand Mktg Grp.*

*LLC v. Intertek Testing Servs., N.A., inc.*, 801 F.3d 347, 360 (3d Cir. 2015) ("'[T]o justify an

award of punitive damages, the fact-finder must determine that the defendant acted with a

culpable state of mind, *i.e.*, with evil motive or reckless indifference to the rights of others.'"

(quoting *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 983-84 (Pa. Super. Ct.

2005)).  Therefore, punitive damages "are not justified where the defendant's mental state rises to no more than gross negligence." *SHV Coal*, 587 A.2d at 705.

To succeed on a claim for punitive damages, a plaintiff must produce sufficient evidence to establish that "(1) a defendant had subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchinson v. Luddy*, 870 A.2d 766, 772 (Pa. 2005).  The Third Circuit has recognized that a district court may determine punitive damage claims on summary judgment. *Vitalis v. Sun Constructors, Inc.*, 481 Fed. Appx. 718, 729 (3d Cir. 2012) (citing *Pichler v. UNITE*, 542 F.3d 380, 387 (3d Cir. 2009) ("If, on remand, the District Court determines that summary judgment is appropriate as to plaintiffs' punitive damages claim, then a trial will be unnecessary."); *Cochetti v. Desmond*, 572 F.2d 102, 103 (3d Cir. 1978) ("As to the claim for punitive damages, we conclude that on the record before the district court summary judgment was proper[.]")).  However, "[t]he determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court so long as that discretion has not been abused." *SHV Coal*, 587 A.2d at 705.

Here, the final claim advanced by Polaris in its Motion for Summary Judgment asserts that Plaintiffs have failed to meet their burden to establish punitive damages.  (Doc. 173 at 23-25).  According to Polaris, the deposition of Steven Wagner, the corporate designee for Federal Mogul/Carter, is "inherently unreliable as there was no foundation for

the document that allegedly showed prior barb breakages" and there is "no admissible evidence to substantiate Polaris' knowledge of prior barb breakages." (*Id.* at 24).

Polaris' argument is misguided. Instead of demonstrating to the Court why there is no dispute as to the facts relevant to Plaintiffs' punitive damages claim, Polaris contends that Plaintiffs have not met their burden to establish a viable claim. Whether Plaintiffs have met their burden of proof to establish a viable claim for punitive damages is not the proper scope of inquiry for the Court on a Motion for Summary Judgment. Thus, the Court finds that Polaris has not satisfied its burden to establish that there is no remaining dispute of material fact on Plaintiffs' punitive damages claim.

Indeed, a question of fact remains about what information, if any, Polaris had knowledge of regarding the alleged fuel barb breakages in other PWCs and Chrysler vehicles. Polaris argues that "[t]here is no admissible evidence to substantiate Polaris' knowledge of the fuel barb breakages," while Plaintiffs point to Mr. Wagner's testimony regarding the List of Reported Breakages as evidence supporting their argument that "Polaris received dozens of reports of fuel barbs breaking." (Doc. 173 at 24; Doc. 185 at 28-29; *see also* Wagner Dep. Tr., Doc. 184-10, Ex. H, at 220:20-224:1 (explaining that the List of Reported Breakages contains 26 reports of fuel barb breakages that Polaris reported to to Federal Mogul). In addition, Dr. Speigelberg,[2] one of Plaintiffs' experts, concluded that

---

[2] In its Reply Brief (Doc. 198), "Polaris asserts that the offered reports of both Mr. Cooke and Mr. Spiegelberg should not be considered in ruling on its motion" and requests leave from this Court to submit reports from Polaris' experts if the Court considers the reports of Dr. Spiegelberg and Mr. Cooke. (Doc.

"[t]he fuel pump and associated fuel barbs were not safe for use in a PWC without a detailed investigation of the effects of long term exposure to heat to the fuel pump." (Doc. 184-11, Ex. I at 10). Dr. Spiegelberg and Mr. Cooke both reference testing that was done on exemplar fuel barbs that found that "an exemplar fuel barb broke with 36.9 pounds of force despite the manufacturer proclaiming the fuel barbs should withstand roughly 44.96 pounds of force in any direction." (Doc. 184-8, Ex. at 16; Doc. 184-11, Ex. H at 9).

The testimony from Mr. Wagner and Dr. Spiegelberg's and Mr. Cooke's reports creates a question of material fact as to whether heat exposure testing should have been done, whether Polaris knew the fuel pump was unsafe to use in the PWC before such testing was conducted, and which entity, Polaris or another Defendant, should have conducted such testing. Furthermore, in addition to these outstanding issues of material fact, and most obvious of all, the Court cannot grant summary judgment on Plaintiffs punitive damages claim because "Pennsylvania law provides that whether a product is defective is a 'question of fact ordinarily submitted for determination to the finder of fact; the

---

198 at 5-6). Polaris argues that the Court cannot properly consider the reports from Plaintiffs' experts because they are "neither sworn not subscribed under the penalty of perjury." (*Id.* at 6). The Court rejects Polaris' argument. "[E]vidence on summary judgment should not be excluded on hypertechnical grounds." *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989). Excluding Plaintiffs' expert reports from the Court's consideration on the instant Motion would be "hypertechnical" because the expert reports in question express expert opinions, and while they rely on facts, as experts may properly do (*see* FRE 701, 702, 703, 705), they present expert opinions which are not properly or reasonably construed as declarations or affidavits of fact subject to the requirements of FRCP 56(c)(4) or 28 U.S.C. § 1746. Accordingly, the Court rejects Polaris' argument that the Court exclude Dr. Spiegelberg's and Mr. Cooke's expert reports from its consideration and denies its request for leave to submit reports from its own experts in that the submission of Polaris' experts, whose opinions are at variance with those of Plaintiffs' experts, would do no more than reinforce the Court's determination that there are issues of fact which can only be resolved at trial.

question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue.'" *Sikkelee*, 907 F.3d at 716 (quoting *Tincher*, 104 A.3d at 335). As discussed above (*supra* Section III.B), questions of fact remain as to whether the PWC was defective, which, in turn, means that there are unresolved issues that are critical to the determination of whether punitive damages are appropriate in this case. "The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed so long as that discretion has not been abused." *SHV Coal*, 587 A.2d at 705.

For these reasons, the Court will deny Polaris' Motion to Dismiss Plaintiffs' punitive damages claim.

## IV. CONCLUSION

Based on the foregoing analysis, the Court will deny Polaris' Motion for Summary Judgment (Doc. 172) for Counts I, II, IV, V, and VI and grant Polaris' Motion as to Count III. A separate Order follows.

Robert D. Mariani
United States District Judge

24