### THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

EUGENE RUDDY and REBECCA   :
RUDDY, husband and wife, individually  :
and as parents of S.R., a minor,    :
                          :
      Plaintiffs,         :
v.                           :     3:17-CV-0423
                          :     (JUDGE MARIANI)
POLARIS INDUSTRIES, INC. et al.,   :
                          :
     Defendants.       :

FILED
SCRANTON

MAR 0 3 2022

Per_____
DEPUTY CLERK

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is the Motion of Defendant, The Moore Company, to Dismiss for Lack of Personal Jurisdiction (Doc. 167) brought by The Moore Company and Motion for Summary Judgment of The Moore Company, Moeller Marine Products (Incorrectly Named as Moeller Marine Products f/k/a Tempo Products, Inc.), Inca Products Acquisition Corporation and Seastar Solutions (Doc. 169). For the reasons that follow, The Moore Company's Motion to Dismiss will be denied and the Motion for Summary Judgment by The Moore Company, Moeller Marine Products, Inca Products Acquisition Corporation, and Seastar Solutions will be denied.

### II. FACTUAL AND PROCEDURAL HISTORY

These claims arise from events which occurred on July 27, 2016 at Wilsonville Campground on Lake Wallenpaupack. (Fourth Amended Complaint, Doc. 69 at ¶ 27). On

that date, Plaintiffs Rebecca Ruddy and Scott Ruddy were allegedly sitting on a personal watercraft ("PWC") that was manufactured and sold by Polaris and when Plaintiffs attempted to turn on the PWC using the ignition, the PWC exploded.  (*Id.* at ¶¶ 1, 28-30).  Plaintiffs Rebecca and Scott Ruddy each suffered severe injuries from the explosion.  (*Id.* at ¶¶ 30-41).  Tempo Products Co. ("Tempo") manufactured the fuel lines/hoses that were incorporated into the subject PWC by Polaris.  (*Id.* at ¶¶ 56-57; Doc. 167 at ¶ 14).

On March 7, 2017, Plaintiffs Eugene Ruddy and Rebecca Ruddy, husband and wife, individually and as parents of S.R., a minor, filed a Complaint (Doc. 1) against multiple defendants.  On November 15, 2017, Plaintiffs filed an Amended Complaint (Doc. 34) that named Moeller Marine Products f/k/a Tempo Products, Inc. as a defendant.  Plaintiffs then filed a Second Amended Complaint (Doc. 48) on May 15, 2018.  Shortly thereafter, Plaintiffs filed a Motion for Leave Pursuant to F.R.C.P. 15 to File a Third Amended Complaint (Doc. 50) so they could add the Moore Company as a defendant in this case.  (Doc. 50 at 1; *see also* Doc. 167 at 2).  Moore opposed Plaintiffs' Motion for Leave, claiming, among other things, that the Court lacked personal jurisdiction over it.  (Doc. 54 at 7-8).  The Honorable Richard P. Conaboy ultimately granted Plaintiffs' Motion, allowing Plaintiffs to file an amended complaint and add Moore as a defendant to the above-captioned action.  *Ruddy v. Polaris, Inc., et al.*, 2018 WL 3388008, at *2 (M.D.Pa. July 12, 2018).  Judge Conaboy noted that "[i]f, as discovery progresses, Moore can demonstrate conclusively that it may not be properly considered an appropriate Defendant in this case, it may then avail itself of

2

other remedies available under the Federal Rules of Civil Procedure." *Id*.  In accordance with Judge Conaboy's Opinion, Plaintiffs filed their Third Amended Complaint (Doc. 65) on July 16, 2018 that, for the first time, named The Moore Company as a defendant.  Plaintiffs then filed a Fourth Amended Complaint on July 18, 2018 (Doc. 69), which is the operative complaint in this action.

The Moore Company has its principal place of business in Rhode Island and is also incorporated in Rhode Island.  (Doc. 167 at ¶ 1).

In 2008, Moore entered into an Asset Purchase Agreement with Tempo so Moore could "purchase remaining assets of Tempo."  (Doc. 167 at ¶ 15; Doc. 169 at ¶ 7; Moore-Tempo Asset Purchase Agreement, Doc. 167-5, Ex. D at 1).  After the execution of the APA, Moore directed Tempo's assets to its division Moeller Marine.  (Doc. 179 at 6).  Soon after the above-captioned action was initiated on March 7, 2017 but before Moore was added as a defendant, Moore sold its one-time division Moeller Marine to Inca Products on May 26, 2017 in an Asset Purchase Agreement between the two companies.  (*See* Moore and Inca Trademark Assignment, Doc. 202-1, Ex. E; Doc. 179-4, Ex. B at 22:10-16).

At the close the discovery, Moore filed the instant Motion to Dismiss for Lack of Personal Jurisdiction.  (Doc. 167).  Moore, together with The Moeller Company, INCA Products Acquisition Corporation, and SeaStar Solutions also filed a Motion for Summary Judgment (Doc. 169).

In Plaintiffs' Counterstatement of Material Facts and Response to Defendants The Moore Company, Moeller Marine Products, Inca Products Acquisition Corporation and Seastar Solutions' Statement of Material Facts (Doc. 186), Plaintiffs failed to respond to Moving Defendants' Statement of Material Facts (Doc. 170) in accordance with Federal Rule of Civil Procedure 56 and Local Rule 56.1.  Instead of responding to the numbered paragraphs within Moving Defendants' Statement of Material Facts (Doc. 170), Plaintiffs responded to the numbered paragraphs within Moving Defendants' Motion for Summary Judgment (Doc. 169).  This carelessness on behalf of Plaintiffs' Counsel suggests a lack of diligence and inattention to detail that could have been fatal to their clients' claims against Moving Defendants.  Only because the Court finds there are sufficient factual disputes in documents and exhibits in the record will the Court not deem Moving Defendants' statements of material fact admitted.  In a case as serious as this, where multiple people, including a young child, suffered severe injuries, the Court expects more from the attorneys representing Plaintiffs.  The Court expects that Plaintiffs' Counsel's future filings will show careful attention to and submission in accordance with both the Federal Rules of Civil Procedure and the Local Rules of Court.

## III. STANDARDS OF REVIEW

### A. Motion to Dismiss for Lack of Personal Jurisdiction

Under Federal Rule of Civil Procedure 12, a defendant may move to dismiss a complaint for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  "Once challenged, the

plaintiff bears the burden of establishing personal jurisdiction." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007). "Plaintiff's jurisdictional allegations must be supported with appropriate affidavits or documents, because a Rule 12(b)(2) motion 'requires resolution of factual issues outside the pleadings.'" *Brooks v. Bacardi Rum Corp.*, 943 F.Supp. 559, 561 (E.D.Pa. 1996) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984)). "However, when the court does not hold an evidentiary hearing on the motion to dismiss, the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004); *see also Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003) ("It is well established that in deciding a motion to dismiss for lack of jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff."). "Of course, by accepting a plaintiff's facts as true when a motion to dismiss is originally made, a court is not precluded from revisiting the issue if it appears that the facts alleged to support jurisdiction are in dispute." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992).

### B. Motion for Summary Judgment

Summary judgment is appropriate "only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary

basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light

most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## IV. ANALYSIS

The Court will address Motion of Defendant, The Moore Company, to Dismiss for Lack of Personal Jurisdiction (Doc. 167) and Motion for Summary Judgment of the Moore

Company, Moeller Marine Products (Incorrectly Named as Moeller Marine Products f/k/a Tempo Products, Inc.), Inca Products Acquisition Corporation and Seastar Solutions (Doc. 169)[1] in turn below.

### A. Motion to Dismiss for Lack of Personal Jurisdiction

"The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant." *Word-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). "Due process requires that the defendant be given adequate notice of the suit and be subject to the personal jurisdiction of the court." *Id.* (internal citations omitted). "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)). In Pennsylvania, the state's long-arm statute provides that personal jurisdiction extends "to the fullest extent allowed under the Constitution of the United States." 42 Pa. C.S.A. 5322(b). Accordingly, this Court may exercise personal jurisdiction over a defendant if doing so does not violate the Due Process Clause. *Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 200 (3d Cir. 1998).

There are two types of personal jurisdiction: general jurisdiction and specific jurisdiction.[2] *Bristol-Myers Squibb Co. v. Superior Court of California*, 137 S.Ct. 1773, 1780

---

[1] By stipulation of the parties (Doc. 194) and Order of this Court, INCA Products Acquisition Corporation and SeaStar Solutions have been dismissed from this case without prejudice.

[2] According to Moore, "[i]t is well settled that federal diversity jurisdiction is determined based on conditions at the time suit is filed. Therefore, at the time suit was filed against Moore, Moeller was no longer a division of Moore so its activities cannot be imputed to Moore for purposes of establishing

(2017). "A court with general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). "Specific jurisdiction is very different. In order for a state court to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'" *Id.* (alterations in original) (quoting *Daimler AG*, 571 U.S. at 127).; *see also Skinner v. Flymo*, 505 A.2d 616, 619 (Pa. Super. Ct. 1986).

### 1. General Jurisdiction

Moore argues that the Court does not have general personal jurisdiction over it because it is a Rhode Island corporation with a principal place of business in Rhode Island and Moore does not have sufficient contacts with Pennsylvania that would make it "essentially at home' here. (Doc. 168 at 5). In response, Plaintiffs allege "general jurisdiction is proper because Moore, by and through its subdivision Moeller Marine Products ("Moeller Marine"), did and does have sufficient continuous and systematic contacts with the Commonwealth to permit the exercise of jurisdiction, including through the

---

jurisdiction." (Doc. 202 at 2 (internal citations omitted)). While this is a true statement of the law for *subject matter* jurisdiction, Moore's Motion to Dismiss is premised upon a lack of *personal* jurisdiction. "Jurisdiction over a nonresident defendant may be based either upon the specific acts of the defendant which gave rise to the cause of action, or upon the defendant's general activity within the forum state." *Skinner v. Flymo, Inc.*, 351 505 A.2d 616, 619 (Pa. 1986) (citing *Burger King Corp.*, 471 U.S. at 472-73). Accordingly, the issue of personal jurisdiction is not resolved simply because Moeller was no longer a subdivision of Moore at the time Moore was added as a defendant in this action.

targeted sale of fuel-line assemblies and accessories to Pennsylvania merchants and consumers." (Doc. 179 at 5).

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear*, 564 U.S. at 919 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 317 (1945)). "With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction. *Daimler AG*, 571 U.S. at 137. (internal quotation marks and alterations omitted). In addition to these two paradigm bases, there may exist "exceptional case[s]" where "a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 761 n. 19; *see also Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016) ("It is . . . incredibly difficult to establish general jurisdiction in a forum other than the place of incorporation or principal place of business.") (quoting *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014)). "A corporation's 'continuous activity of some sorts within a state,' . . . 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" *Goodyear*, 564 U.S. at 927 (quoting *Int'l Shoe*, 326 U.S. at 318).

Here, it is clear that the Court does not have general personal jurisdiction over Moore. Moore is a nonresident corporation that is both incorporated in and has its principal

place of business in Rhode Island. (Doc. 165 at ¶ 9; *see also* Doc. 69 at ¶ 16). Therefore, the Court cannot assert general jurisdiction over Moore using its place of incorporation or principal place of business.

Neither can the Court asset general personal jurisdiction over Moore based on Moore's operations because they are not "so substantial and of such a nature as to render [Moore] at home" in Pennsylvania. *See Daimler AG*, 571 U.S. at 761 n.19. Moore does not own, lease, rent, or operate real property or other facilities in Pennsylvania, does not have bank accounts in Pennsylvania, or have employees in Pennsylvania. (Doc. 167-3, Ex. B at ¶¶ 2-6). The same is true for both of Moore's current subdivisions, Darlington Fabrics and George C. Moore, with the one exception that "Darlington Fabrics had one employee located in Pennsylvania who worked from him home who retired in January 2019." (*Id.* at ¶¶ 2-7). Plaintiffs draw the Court's attention to the fact that Tempo and then Moore after Moore purchased the assets of Tempo in 2008 "target[ed] this Commonwealth for the sale of its products throughout the time period relevant to Plaintiffs' claims." (Doc. 179 at 20). According to Plaintiffs, Moeller had a catalog that they allege sold fuel lines "to vendors and consumers throughout Pennsylvania" and "Moore continued to sell fuel-line products specifically to Pennsylvania merchants and consumers after it acquired Tempo" through its website. (*Id.* at 7-11 (emphasis omitted)).

The Court finds that Plaintiffs evidence, which consist of excerpts from Moeller Marine catalogs and Tempo and Moeller's websites, do not establish sufficient "continuous

or systematic" contacts between Tempo and Pennsylvania, or between Moore and

Pennsylvania.  *See Suglio v. Cabaret Lounge*, 344 F. App'x 724, 726 (3d Cir. 2009) ("Even

if these reviews are advertisements, 'the mere posting of information or advertisements on

an Internet website does not confer nationwide personal jurisdiction.'" (quoting *Remick v.*

*Manfredy*, 238 F.3d 248, 259 n.3 (3d Cir. 2001)); *Rocke v. Pebble Beach Co.*, 541 F. App'x

208, 210-11 (3d Cir. 2013) (holding that receiving mailings and emails from the non-resident

defendant did not "meet the continuous and systematic presence needed to establish

general jurisdiction").  As such, Moore's contacts are not so significant or of such a nature

that they render Moore at home in Pennsylvania, such that general personal jurisdiction

would be proper.  *See Malik v. Cabot Oil & Gas Corp.*, 710 F. App'x 561, 563-4 (3d Cir.

2017) (holding that the defendant's contacts with the forum "do not demonstrate the type of

substantial or continuous and systematic contact that would render [the defendant] 'at

home' in the State").  Therefore, the Court cannot assert general jurisdiction over Moore.

## 2. Specific Jurisdiction

Turning to the issue of specific jurisdiction, the Third Circuit has established a three-

part test to determine whether a district court can exercise specific personal jurisdiction over

a defendant.  *See O'Connor*, 486 F.3d at 317.

> First, the defendant must have 'purposefully directed [its] activities' at the
> forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174,
> 85 L.Ed.2d 528 (1985) (quotation marks omitted).  Second the litigation must
> "arise out of or relate to" at least one of those activities. *Helicopteros*, 466 U.S.
> at 414, 104 S.Ct. 1868; *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1559
> (3d Cir. 1994).  And third, if the prior two requirements are met, a court may

consider whether the exercise of jurisdiction otherwise "comport[s] with fair play and substantial justice." *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174 (quoting *Int'l Shoe*, 326 U.S. at 320, 66 S.Ct. 154).

*Id.* The first two steps address "whether a defendant has the requisite minimum contacts with the forum," and the third step concerns whether exercising jurisdiction over the defendant is reasonable under the circumstances. *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009).

Moving Defendants contend that they do not have sufficient contacts with Pennsylvania. (Doc. 168 at 5). As mentioned above, Moore does not own, lease, rent, or operate real property or other facilities in Pennsylvania, does not have bank accounts in Pennsylvania, and only had one employee at its division Darlington Fabrics working from home in Pennsylvania at the time the above-captioned matter was filed, but that employee left Moore in 2019. (Doc. 167-3, Ex. B at ¶¶ 2-6). Moore asserts that it does not "operate in Pennsylvania or sell products in Pennsylvania." (Doc. 168 at 5).

The Court finds that Moore has not "purposefully directed its activities" toward Pennsylvania. *O'Connor*, 486 F.3d at 317 (citing *Burger King Corp.*, 471 U.S. at 472). The burden is on Plaintiffs to prove that personal jurisdiction is sufficient over the defendant, and Plaintiffs have not met their burden. Plaintiffs do not argue that Moore, on its own and based on its own contact with Pennsylvania, has purposefully directed its activities towards Pennsylvania. Instead, Plaintiffs argue that "Moore is subject to specific jurisdiction based upon the contacts that it had with Pennsylvania as a successor to the original manufacturer

of the defective fuel lines, Tempo." (Doc. 179 at 15).  Essentially, Plaintiffs make the argument that the Court has proper specific personal jurisdiction over Moore through the application of the product-line exception to successor non-liability.  (*Id.*).

Moore maintains "it is not liable under the product line exception as set forth in Defendant's Motion for Summary Judgment (Doc. 169) because it did not manufacture the same fuel lines at issue." (Doc. 202 at 3).  According to Moore, "the transaction between Tempo and Moore was simply a sale of assets for adequate consideration," so the Court should not consider Tempo's conduct for jurisdictional purposes.  (Doc. 168 at 6).  Plaintiffs, on the other hand, argue that the product line exception should apply because Moore "continu[ed] to carry out the sale of defective fuel lines (1/4 inch Type B1 model) after acquiring Tempo." (Doc. 179 at 15).

"Generally, when a company sells or transfers all of its assets to a successor, the successor does *not* acquire the liabilities of the transferor merely because of its succession to the transferor's assets." *Simmers v. Am. Cyanamid Corp.*, 576 A.2d 376, 385 (Pa. Super. Ct. 1990) (citing *Dawejko v. Jorgenson Steel Co.*, 434 A.2d 106 (Pa. 1981)).

> However, the general rule does not apply and liability attaches to the successor when one of the following is shown:
>
> 1) The purchaser expressly or impliedly agreed to assume such obligation;
> 2) The transaction amounts to a consolidation or merger;
> 3) The purchasing corporation is merely a continuation of the selling corporation;
> 4) The transaction is fraudulently entered into to escape liability;

5) The transfer was not made for adequate consideration and provisions were not made for the creditors of the transferor;

6) The successor undertakes to conduct the same manufacturing operation of the transferor's product lines in essentially an unchanged manner. The successor is then strictly liable for injuries caused by defects in the product line, even if previously manufactured and distributed by the transferor.

*Dawejko v. Jorgenson Steel Co.*, 290 Pa. Super. at 18, 23, 434 A.2d at 107, 110. See also *Philadelphia Electric Company v. Hercules, Inc.*, 762 F.2d 202 (3d Cir. 1985) (applying Pennsylvania successor liability law).

*Simmers*, 576 A.2d at 386. The *Simmers* Court "emphasize[d] that the acts of a predecessor will not be attributed to its successor when the transaction only amounts to a sale of assets for adequate consideration" and none of the aforementioned exceptions apply. *Id.* at 576 A.2d at 488 (citation omitted).

Although imprecise, Plaintiffs appear to rest their basis for personal jurisdiction on the product line exception to successor non-liability. Pursuant to this exception,

a successor company which purchases and manufactures a predecessor's product line cannot avoid the jurisdiction of those forums wherein the product was previously manufactured and distributed. In Pennsylvania, it is now the law that when the successor is subject to the liabilities of its predecessor, the acts of a predecessor corporation may be attributed to its successor for the purposes of determining whether jurisdiction is proper.

*Simmers*, 576 A.2d at 390. The product line exception to successor non-liability applies

where one corporation acquires all of the manufacturing assets of another corporation and undertakes essentially the same manufacturing operation as the selling corporation, . . . the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

*Childers v. Power Line Equip. Rentals, Inc.*, 681 A.2d 201, 213 (Pa. Super. Ct. 1996) (citing

*Dawejko*, 434 A.2d at 106).

The first issue is whether Moore purchased all or substantially all of the

manufacturing assets of Tempo. *See id.*, 681 A.2d at 213; *Dawejko*, 434 A.2d at 110.  In its

Motion to Dismiss, Moore does not argue that they did not purchase all or substantially all of

the manufacturing assets of Tempo, but Moore does state that it "simply purchased the

remaining assets of Tempo." (Doc. 202 at 3).  For purposes of the Motion to Dismiss only

and taking Plaintiffs' allegations as true, as we must, the Court finds that Plaintiffs have

established a prima facie case that Moore purchased all or substantially all of Tempo's

manufacturing assets in 2008.

Based on the parties' briefings, it appears that the crux of the dispute regarding the

applicability of the product line exception for purposes of jurisdiction concerns whether

Moore "undertakes to conduct the same manufacturing operation of [Tempo's] product lines

in essentially an unchanged manner." *Simmers*, 576 A.2d at 386 (citing *Dawejko*, 343 A.2d

at 107, 110).

Here, the evidence shows that after Moore purchased the assets of Tempo, Moore

continued to sell and distribute the same type of fuel lines that Tempo manufactured for the

Ruddy PWC, and there is at least a question of whether Moore, through Moeller, also

manufactured these fuel lines.  Plaintiffs have submitted excerpts from Moeller Marine's

catalog that demonstrates that through Moeller, Moore sold a ¼ inch Type B1 fuel line for

use in PWCs long after the APA between Tempo and Moore was executed. (Doc. 179 at 8; *see* Doc. 179-5, Ex. C; Doc. 179-6, Ex. D). This ¼ inch Type B1 fuel line is the same type of fuel line that was manufactured by Tempo and used in the Ruddy PWC. (Doc. 179 at 7-8). In the catalog excerpts, "Moeller" can be seen stamped or printed on the bulk fuel hose advertisement in Exhibit D. (Doc. 179-6, Ex. D at 3). The Court is satisfied that Plaintiffs have presented sufficient evidence to establish a prima facie case that Moore undertook the same manufacturing operations of the ¼ inch Type B1 fuel line after it purchased the assets of Tempo. Accordingly, the Court finds that Plaintiffs have established a prima facie case that the product line exception to successor non-liability can be applied to Moore for purposes of the Motion to Dismiss.

Next, the Court must determine if it could have asserted specific personal jurisdiction over Tempo. Plaintiffs argue that "Tempo, and later Moore following the APA, specifically targeted sales toward and sold fuel-line products in Pennsylvania, including the same exact model alleged to be defective here." (Doc. 179 at 17). In 2009, approximately one after Moore purchased the assets of Tempo, including Tempo's website and domain name, the still-active Tempo website allowed visitors to search for where to purchase Tempo products in Pennsylvania. (Doc. 179-8, Ex. F at 2; *see also* Alexandra Moore Dep. Tr., Doc. 179-4, Ex. B at 38:1-6). In her deposition, Ms. Moore explained that "Moeller did not operate the Tempo Website" at any time after 2008. (Doc. 179-4, Ex. B at 80:13-17; 81:20-82:7). This suggests that while the website was not updated by Moeller or Moore, Tempo's website

17

remained the same as it did prior to the execution of the APA.  In addition, Moeller's website

had a similar feature that allowed visitors to "Find a Dealer" and showed all dealers in

Pennsylvania that sold Moeller products.  (Doc. 179-9, Ex. G at 1).

The Court is satisfied that Plaintiffs have established a prima facie case of Tempo's,

and therefore Moore's, contacts with Pennsylvania. *See Miller Yacht Sales*, 384 F.3d at 97

(citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002); *Carteret Sav. Bank

FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992)).  Drawing all disputed facts in favor of

Plaintiffs, the Court finds that there exist sufficient minimum contacts for personal

jurisdiction purposes.

Next, the Court must determine whether Plaintiffs' alleged harms "arise out of or

relate to" Tempo's contacts with Pennsylvania.  Plaintiffs were injured after their PWC,

which allegedly contained defective Tempo fuel lines, exploded, which relates to Tempo's

sales in Pennsylvania. (*See* Doc. 179 at 5-6).  Tempo and Moeller's, and therefore

Moore's, alleged contacts with Pennsylvania are related to Plaintiffs' claims because the

contacts deal with the manufacturing and sale of fuel lines, which Plaintiffs allege was

defective in the Ruddy PWC. (*See id.*).  Accordingly, the second prong of the specific

jurisdiction test is satisfied.

Finally, the Court "must consider whether the exercise of jurisdiction would otherwise

comport with 'traditional notions of fair play and substantial justice.'" *O'Connor*, 496 F.3d at

324 (quoting *Int'l Shoe*, 326 U.S. at 316).  "The existence of minimum contacts makes

jurisdiction presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King*, 471 U.S. at 477; citing *Pennzoil Prods.*, 149 F.3d at 207).  Courts consider several factors when balancing the reasonableness of specific jurisdiction, including "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (citations and quotations omitted).

Here, the Court finds it would not be unreasonable or unfair to require Moore to face trial in Pennsylvania.  Moore does not present any arguments that would suggest this is "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *See Burger King*, 471 U.S. at 477; *see also Miller Yacht Sales, Inc.*, 384 F.3d at 100 ("There is no compelling evidence of record why it would be unfair or unjust to litigate this dispute in New Jersey.  Without such compelling evidence, they cannot avoid the District Court's appropriate jurisdiction."); (*see generally* Doc. 167; Doc. 168; Doc. 202). The PWC explosion occurred in Pennsylvania and Plaintiffs live in Pennsylvania, which are factors that weigh in favor of finding that it is reasonable to find that there is valid personal jurisdiction over Moore.  The Court agrees with Plaintiffs that Pennsylvania "has a substantial interest in protecting its residents from catastrophic injuries due to defective

products that end up being sold through the Commonwealth." (Doc. 179 at 18). Finally, the interstate judicial system has a strong interest in a finding of personal jurisdiction over Moore because there are multiple other defendants involved in this suit and a finding of personal jurisdiction would lead to the most efficient resolution of the case.

For the aforementioned reasons, the Court will deny Moving Defendants' Motion to Dismiss for Lack of Personal Jurisdiction. (Doc. 167). Nothing in this section of the Memorandum Opinion should be construed or understood to mean that Moving Defendants may not invoke Federal Rule of Civil Procedure 50(a) to assert the claim that Plaintiffs have failed to prove that the product line exception to successor non-liability is applicable to Moving Defendants at trial.

### B. Motion for Summary Judgment (Doc. 169)

Defendants The Moore Company, Moeller Marine Products, INCA Products Acquisition Corporation, and SeaStar Solutions ("Moving Defendants") also filed a Motion for Summary Judgment that requests this Court to dismiss all claims and crossclaims asserted against them. (Doc. 169 at 15). Although Moving Defendants request this relief, they failed to make any arguments as to why the Court should dismiss Plaintiffs claims for loss of consortium or negligent infliction of emotional distress. Thus, the Court will only determine whether Moving Defendants are entitled to summary judgment on Plaintiffs claims for negligence, strict liability, breach of warranty, and gross negligence, recklessness, malice (punitive damages).

Moving Defendants' central argument is that the product line exception to the rule of successor non-liability is inapplicable here because Moving Defendants did not manufacture the same fuel lines as Tempo after they purchased Tempo's assets in 2008. (Doc. 171 at 28-29). While Moore made reference to why the product line exception should not apply in its Motion to Dismiss (*see supra* Section IV.a), Moving Defendants' Motion for Summary Judgment contains a more detailed discussion as to why they believe it is not applicable in this case. If this Court finds that the product-line exception does apply, Moving Defendants argue in the alternative that the fuel lines "were not defective at the time [they] left control of Tempo since it was a component part designed, tested and installed by Polaris in the final product and its alleged 'defect' only manifested itself after that installation near other engine component as decided by Polaris and over time and exposure to heat." (*Id.* at 29). Moving Defendants further argue in their Motion that Plaintiffs' claims for punitive damages and breach of warranty "are unavailable under the facts of this case." (*Id.*).

### 1. Strict Liability

Pennsylvania law on the doctrine of products liability governs in a diversity action. *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 113 (3d Cir. 1992). The Supreme Court of Pennsylvania has adopted Section 402A of the Restatement (Second) of Torts. *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 359 (Pa. 2014) (citing *Webb v. Zern*, 220 A.2d 853 (Pa. 1966)). Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or the consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

    a. The seller is engaged in the business of selling such product, and

    b. It is expected to and does reach the consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

    a. The seller has exercised all possible care in the preparation and sale of his product, and

    b. The user or consumer has not bought the product from or entered into any contractual relation with the seller.

To prevail on a strict liability claim, the plaintiff must prove that the product was defective due to a manufacturing, design, or failure-to-warn defect, that the defect existed when it left the defendant's hands, and that the product's defect caused the alleged harm. *Igwe v. Skaggs*, 258 F.Supp.3d 596, 609 (W.D.Pa. 2017) (*citing High v. Pa. Supply, Inc.*, 154 A.3d 341, 345-46 (Pa. Super. 2017)).

"[A] plaintiff pursuing a cause upon a theory of strict liability in tort must prove that the product is in a 'defective condition'" by demonstrating "either that (1) the danger is unknowable and unacceptable to the average or ordinary consumer, or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." *Tincher*, 104 A.3d at 335. The *Tincher* Court held that the issue of

> [w]hether a product is in a defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue. Thus, the trial court is relegated to its traditional role of determining issues of law, *e.g.*, on dispositive motions, and articulating the law

22

for the jury, premised upon the governing legal theory, the facts adduced at trial and relevant advocacy by the parties.

*Id. Tincher* further explained that trial courts "do not necessarily have the expertise to conduct the social policy inquiry into the risks and utilities of a plethora of products and to decide as a matter of law, whether a product is unreasonably dangerous except perhaps in the most obvious cases." *Id.* at 380; *see also Lewis v. Lycoming*, 2015 WL 3444220, at *4 (E.D.Pa. May 29, 2015) ("There is ample room in the present record for the jury to decide what balance of risk and utility or what consumer expectations are appropriate with respect to the fuel servo."). With respect to strict liability claims that implicate the risk-utility calculus, the *Tincher* Court reasoned that

> when a plaintiff proceeds on a theory that implicates a risk-utility calculus, proof of risks and utilities are part of the burden to prove that the harm suffered was due to the defective condition of the product. The credibility of witnesses and testimony offered, the weight of evidence relevant to the risk-utility calculus, and whether a party has met the burden to prove the elements of the strict liability cause of action are issues for the finder of fact, whether the finder of fact is a judge or jury. A question of whether the party has met its burden of proof is properly 'removed' – for example, via adjudication of a dispositive motion – 'from the jury's consideration only where it is clear that reasonable minds [cannot] differ on the issue.' *Hamil v. Bashline*, 481 Pa. 256, 392 A.2d 1280, 1284-85 (1978).

*Tincher*, 104 A.2d at 408.

Manufacturers of both component parts and completed products can be held strictly liable, but Pennsylvania law limits a component part manufacturer's liability in cases that pursue a failure-to-warn defect theory. *See Tincher*, 104 A.3d at 402 ("[A] duality in the strict liability cause of action is evidence in the expectation that all sellers in the distributive

23

chain are legally responsible for the product in strict liability."). The Supreme Court of Pennsylvania explained that "limits on a manufacturer's duty to warn are placed at issue where, as in the present case, the manufacturer supplies a mere component of a product that is assembled by another party and dangers are associated with the use of the finished product." *Jacobini v. V & O Press Co.*, 588 A.2d 476, 478 (Pa. 1991) (*citing Wenrick v. Schloemann-Siemag Aktiengesellschaft*, 523 Pa. 1, 564 A.2d 1244 (Pa. 1989)); *see also Fleck*, 981 F.2d at 117-18. The *Jacobini* Court noted that this limitation is "particularly true where the danger arises from the manner in which the component is utilized by the assembler of the final product, this being the matter over which the component manufacturer has no control." *Id.* at 479; *see also Fleck*, 981 F.2d at 118 ("[*Jacobini*] added dictum, however, that a manufacturer's duty to warn is limited when it supplies a component of a final product that is later assembled by another party and the dangers are associated with the use of the finished product.").

Courts in the Third Circuit have explained that "a component part manufacturer is relieved of a duty to warn only when the use to which its component part was put was not foreseeable to the manufacturer." *Colegrove v. Cameron Mach. Co.*, 172 F.Supp.2d 611, 627 (W.D.Pa. 2001); *see also Kurzinsky v. Petzl America, Inc.*, 794 F. App'x 187, 190 (3d Cir. 2019); *Stephens v. Paris Cleaners, Inc.*, 885 A.2d 59, 69 (Pa. Super. Ct. 2005) (applying *Colegrove*'s interpretation of Pennsylvania caselaw in this area and stating "[w]e find particularly instructive for purposes of this case the *Colegrove* court's note addressing

the issue of causation with regard to a strict liability claim predicated on failure to warn"). Thus, "the critical inquiry is whether the manufacturer could foresee the use to which the component was put when incorporated into the finished product of another." *Id.* at 629; *Fleck*, 981 F.2d at 118 ("Since Hoffinger knew that its liner would ultimately be incorporated into a pool, and nothing else, it can then reasonably foresee the potential risk of failing to affix warning labels.").

### i. Product Line Exception to Successor Non-Liability[3]

Moving Defendants' main argument in support of their Motion for Summary Judgment depends on the applicability of the product line exception to successor liability. Moving Defendants rely on many of the same arguments as they did in their separately filed Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 167). (*See supra* Section IV.A). According to Moving Defendants, since they do not "manufacture fuel lines/hoses, and did not purchase such manufacturing operations from Tempo, there can be no liability under the product line exception." (Doc. 171 at 19). In response, Plaintiffs argue that Moving Defendants can be held liable via the product line exception to successor non-liability. (Doc. 187 at 7). According to Plaintiffs, Moving Defendants purchased all or substantially all

---

[3] Moving Defendants argue in their Reply (Doc. 199) that "[t]he caselaw is clear that the product-line exception only applies to strict liability claims." (Doc. 199 at 2). Plaintiff cites to a footnote in *Rivera v. Mossberg Industries, Inc.* which states, "Plaintiff's negligence and breach of warranty claims must fail as a matter of law. Plaintiff's only viable claim against Defendant as a successor in interest sounds in strict liability." *Rivera v. Mossberg Indus., Inc.*, 2000 WL 464058, at *3 n.1 (E.D.Pa. April 20, 2000). The *Rivera* Court, however, does not include a detailed analysis as to why the breach of warranty and negligence claims failed as a matter of law. In any event, while *Rivera* may be considered persuasive authority, for the reasons set forth herein, the Court declines to accept the footnote as authority in this case.

25

of the manufacturing assets of Tempo and, after the execution of the APA, Moving

Defendants undertook the same manufacturing operation of Tempo. (*Id.*).

In Dana Barlow's affidavit, the Chief Executive Officer and Treasurer of The Moore

Company at the time of the APA with Tempo in 2008, he stated that "The Moore Company

did not acquire any fuel line/hose manufacturing operations of Tempo Products, Co., Inc.

since Tempo Products Co., Inc. had ceased operations and its facility was located in Ohio."

(Barlow Affidavit, Doc. 170-4, Ex. D at ¶ 5; *see also* Doc. 199 at 5). In contrast, as Plaintiffs

call attention to in their Opposition to Moving Defendants' Motion for Summary Judgment,

Ms. Moore agreed during her deposition that "Moore acquired all or substantially all of the

manufacturing assets of Tempo" at the time of the APA. (Alexandra Moore Dep. Tr., Doc.

186-13, Ex. K at 90:10-19; *see also* Doc. 187 at 7-9). Additionally, the APA itself states that

Moore acquired "the Tempo molds and machinery," but these terms are not defined or

described in the APA. (Tempo APA, Doc. 186-12, Ex. J at 2).

The affidavit of Mr. Barlow, deposition of Ms. Moore, and the APA itself demonstrate

that there is a genuine issue regarding whether Moving Defendants purchased "all or

substantially all of the manufacturing assets" of Tempo. *See Dawejko*, 434 A.2d at 110

(citation omitted). A jury could reasonably draw inferences based on what was included

with "the Tempo molds and machinery" that Moore purchased, and the credibility of both Mr.

Barlow and Ms. Moore is at issue. "Credibility determinations, the weighing of evidence,

and the drawing of legitimate inferences from the facts are jury functions, not those of a

judge, whether he is ruling on a motion for summary judgment or for a directed verdict."
*Anderson*, 477 U.S. at 255; *see also Tincher*, 104 A.3d at 407 ("The credibility of witnesses
and testimony offered, the weight of evidence relevant to the risk-utility calculus, and
whether a party has met the burden to prove the elements of the strict liability clause of
action are issues for the finder of fact.").  Thus, the issue of whether Moving Defendants
purchased "all or substantially all of the manufacturing assets of Tempo" is a question of
fact for the jury, not the Court, to decide.

Furthermore, there is a genuine issue as to whether Moving Defendants
manufactured the product at issue, namely, the ¼ inch Type B1 fuel line.  Moving
Defendants assert that "Moore did not have access to nor did it purchase any designs,
testing data or manufacturing operations of Tempo relative to the subjective fuel
lines/hoses" and "[n]either Moore nor Moeller manufactured or distributed Tempo-
manufactured/designed fuel lines/hoses similar to the subject fuel lines/hoses."  (Moving
Defendants' Statement of Material Facts, Doc. 170 at ¶¶ 15-16).  Moving Defendants argue
that "all of the evidence indicates that none of the Moving Defendants manufactured the
same fuel lines/hoses at issue in this incident."  (Doc. 171 at 20).

The evidence submitted by Plaintiffs, however, shows that there is a genuine issue
of material fact as to whether Moving Defendants "undert[ook] the essentially the same
manufacturing operation as the selling corporation[.]" *Childers*, 681 A.2d at 213 (citing
*Dawejko*, 434 A.2d at 106).  As discussed above, excerpts from Moeller's catalogs show

that Moeller advertised a ¼ inch Type B1 fuel line for sale and in one advertisement,

"Moeller" can be seen stamped onto the fuel line.  (Doc. 186-15, Ex. M at 3; Doc 186-17,

Ex. O at 3).  According to Plaintiffs, the advertisements in the Moeller catalogs are evidence

that "Moore/Moeller manufactured/distributed the same ¼ inch Type B1 fuel lines as Tempo

after the APA."  (Doc. 187 at 10).

Mr. Barlow admitted in his affidavit that Moving Defendants "did distribute its own

fuel lines in 'bulk hose' both before and after the Asset Purchase Agreement with Tempo

Products Co., but such distribution was only to the aftermarket industry, not to original

equipment manufacturers, such as Polaris."  (Barlow Affidavit, Doc. 170-4, Ex. D at ¶ 8).

Mr. Barlow's statement focuses on the buyer or customer of the product at issue

("aftermarket industry" versus "original equipment manufacturers"), but that is not an inquiry

relevant to the product line exception.  The product line exception focuses on whether the

successor company "undertakes essentially the same manufacturing operation as the

selling corporation" and is not concerned with to whom the product is distributed.  *Childers*,

681 A.2d at 213 (citing *Dawejko*, 434 A.2d at 106).  Nothing in the Moeller catalog that

advertises the fuel lines indicates that a different company manufactured the fuel lines, nor

do Moving Defendants clarify who manufactured the fuel lines they allege they sold in bulk.

(*See generally* Doc. 186-15, Ex. M; Doc. 186-17, Ex. O; Doc. 199).  Thus, there remains a

genuine issue of material fact regarding whether Moving Defendants undertook the same

manufacturing operation as Tempo after the APA.

Because genuine issues of fact remain as to both elements of the product line exception to successor non-liability, the applicability of which is a prerequisite to holding Moving Defendants strictly liable, the Court will deny Moving Defendants' Motion for Summary Judgment for Plaintiffs' claim for strict liability.

### ii. Defective Fuel Lines

Plaintiffs' Fourth Amended Complaint contains claims for negligence (Count I) and strict liability (Count II). While the strict liability claim sounds in claims of design defect, manufacturing defect, and warning defect, Plaintiffs failed to separate these claims into discrete counts, opting instead to generally plead "strict liability." (Doc. 69 at ¶¶ 74-82). Despite Plaintiffs' imprecise pleading, the Court will address each type of defect described in their strict liability claim.

In a strict products liability action, a plaintiff must show that (1) the product was defective, (2) the defect proximately caused the plaintiff's injury, and (3) the defect existed at the time the product left the defendant's control. *Warnick v. NMC Wollard, Inc.*, 512 F.Supp.2d 318, 322 (W.D.Pa. 2007) (citing *Pavlik v. Lane Ltd.*, 135 F.3d 876, 881 (3d Cir. 1998)). To prevail in a negligence action, a plaintiff must plead and prove that (1) the defendant owed a duty of care (2) the breach of which (3) caused (4) damages. *Berrier v. Simplicity Mfg. Inc.*, 563 F.3d 61 (3d Cir. 2009). Under either theory, the threshold inquiry is whether the product is in a defective condition. *Warnick*, 512 F.Supp.2d at 323. A plaintiff may prove that a product is in a defective condition by showing either that (1) the danger is

unknowable and unacceptable to the average or ordinary consumer (consumer expectations test) or (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweighs the burden or costs of taking precautions (risk-utility test). *Tincher*, 104 A.3d at 335. Under either test, whether a product is in a defective condition is generally a question of fact to be decided by the jury. *Id.*

Moving Defendants argue that the fuel lines manufactured and supplied by Tempo were not defective. (Doc. 171 at 24). Moving Defendants fail to address the consumer expectations test or the risk utility test described in *Tincher* to support their argument that the fuel lines were not defective. (*See generally id.*; Doc. 199). Instead, Moving Defendants argue that "[a] component manufacturer, such as Tempo, cannot be held responsible for this alleged 'defect' since Polaris is the one who incorporated it into its product, placed it where it determined to would best perform and conducted ongoing durability tests." (Doc. 171 at 24). They continue, "compliance with SAE standards refutes the notion that the lines/hoses were defective when they left Tempo's control" and that the "line/hose itself was not defective." (*Id.* at 24-26). According to Moving Defendants, "[i]t is the use of the fuel lines/hoses in the Polaris-designed pwc which gives rise to the alleged liability, not the manufacture of them." (*Id.* at 25).

Plaintiffs contend in their Fourth Amended Complaint and in their Brief in Opposition that the Tempo fuel lines were defective at the time Tempo manufactured them and when they left Tempo's control. (*See e.g.*, Doc. 69 at ¶ 70(a)-(t); Doc. 187 at 15-18). Plaintiffs

cite to the reports of their experts, David Cooke, P.E., and Dr. Stephen Spiegelberg, Ph.D., to argue that the fuel lines were both "defective in the setting in which they were installed" and defective at the time of manufacture.[4] (Doc. 187 at 17; *see also* Doc. 186-8, Ex. F; Doc 186-11, Ex. I). Mr. Cooke concluded that normal PWC conditions caused the fuel lines manufactured by Tempo to "breakdown" and shrink, and these defects were present in the fuel lines when they left Tempo's control. (Doc. 186-8, Ex. F at 16-17). According to Mr. Cooke, "Polaris and Tempo knew, or should have known, that the fuel lines would shrink over time." (*Id.* at 18). Furthermore, Mr. Cooke found that the design of the fuel system, including Tempo's fuel lines, "failed to meet a risk/utility/benefit test considering the availability of alternative designs, their cost and the magnitude of risk of the existing design" and specifically mentioned that "longer heat resistant fuel lines" were a reasonable alternative design relative to the "overall cost of the PWC and the magnitude of the hazard and risk of personal injury, death, and property damage." (*Id.* at 17).

Dr. Spiegelberg similarly concluded that the shrinkage of the Tempo fuel lines contributed to the Ruddy PWC explosion. (Doc. 186-11, Ex. I at 4, 9-11 ("All of the failures

---

[4] Defendants argue that the Court cannot properly consider the expert reports from Mr. Cooke and Dr. Spiegelberg because "they have not been sworn to as required by F.R.C.P. 56(c)(4)." (Doc. 199 at 12). However, "evidence on summary judgment should not be excluded on hypertechnical grounds." *Fowle v. C & C Cola*, 868 F.2d 59, 67 (3d Cir. 1989). Excluding Plaintiffs' expert reports from the Court's consideration on the instant Motion would be "hypertechnical" because the expert reports in question express expert opinions, and while they rely on facts, as experts may properly do (*see* FRE 701, 702, 703, 705), they cannot properly or reasonably be construed as declarations or affidavits of fact subject to the requirements of FRCP 56(c)(4). Accordingly, the Court declines Moving Defendants' invitation to exclude Dr. Spiegelberg's and Mr. Cooke's expert reports from its consideration.

by Polaris and the fuel component manufacturers (Federal Mogul, Carter Fuel and Tempo) were a factual cause of the injuries suffered by Rebecca and Scott Ruddy.")).  Dr. Spiegelberg explained that "[t]he mechanical and economic feasibility of an improved design was available, reasonable and necessary and included longer fuel lines, heat tested fuel lines, metal barbs and instructions for periodic checking and replacement of the fuel lines and fuel barbs." (*Id.* at 11).  He also explained that although Tempo's fuel lines complied with SAE 1527, this standard does not require fire exposure testing, which, according to Dr. Spiegelberg, should have been conducted.  (*Id.* at 8, 11, 24).

According to Moving Defendants, "Polaris was in the best position relative to the design, testing and integration of the fuel lines/hoses into its final product as testified to by Mr. Knudtson," but fail to provide a direct citation to the deposition transcript of Mr. Knudtson to support this statement.  (Doc. 171 at 26).  After reviewing Mr. Knudtson's deposition transcript, the Court could not find support for Moving Defendants' statement in the transcript.  (*See generally*, Knudtson Dep. Tr., Doc. 170-1, Ex. A).  Mr. Knudtson explained that "the fuel lines have very specific industry standards that they are required to meet.  And we ensure that those fuel lines meet those industry standards[,]" (*Id.* at 51:7-11), but he does not say that Polaris is the *only* entity that ensures the fuel lines meet the applicable industry standards, nor does he state, as Moving Defendants claim, that "Polaris was in the best position relative to the design, testing and integration of the fuel lines/hoses" to conduct such testing.  (*See* Doc. 171 at 26).

32

Finally, Moving Defendants argue that "[c]ourts have held, without hesitation, that component manufacturers have limited, if any, liability for their parts when they had nothing to do with the design testing or integration of their part into a final product." (Doc. 171 at 25).  Moving Defendants are incorrect.  "[A] component parts manufacturer is relieved of a duty to warn only when the use to which its component part was put was not foreseeable to the manufacturer."  *Colegrove*, 172 F.Supp.2d at 627; *see also Stephens*, 885 A.2d at 69 (applying *Colegrove*'s interpretation of Pennsylvania caselaw in this area and stating "[w]e find particularly instructive for purposes of this case the *Colegrove* court's note addressing the issue of causation with regard to a strict liability claim predicated on failure to warn").  "[T]he critical inquiry is whether the manufacturer could foresee the use to which the component was put when incorporated into the finished product of another."  *Id.* at 629; *Fleck*, 981 F.2d at 118 ("Since Hoffinger knew that its liner would ultimately be incorporated into a pool, and nothing else, it can then reasonably foresee the potential risk of failing to affix warning labels.").

Here, Plaintiffs argue that "Tempo knew the fuel lines would be installed in a setting with an engine" and, because engines create heat, Tempo should have provided warnings that "their product could create a danger due to heat exposure." (Doc. 187 at 18).  The schematic that Polaris used to indicate the specifications it required for the fuel line indicated that Polaris needed marine fuel line and that the fuel hose would be used for a "fuel-feed/vent hose." (Doc. 186-14, Ex. L at 2).  This creates a genuine issue of fact as to

whether Tempo could foresee the use to which its fuel lines would be put, thereby precluding the Court from granting summary judgment on Plaintiffs' failure to warn claim.

Furthermore, Dr. Spiegelberg claimed that a new design of the fuel lines, along with "improved warnings and instructions" were available and reasonable, and the financial cost of such changes "was minimal compared to the risk of severe injury or death." (Doc. 186-11, Ex. I at 11).  Mr. Cooke also concluded that "[t]he defects in the design and warnings of the Polaris Virage i gasoline fuel system[,]" which would include the fuel lines, "caused the injuries sustained by Rebecca Ruddy and Scott Ruddy." (Doc. 186-8, Ex. F at 17).  This evidence makes it clear that there exist outstanding questions of fact on whether the warnings, or lack thereof, for Plaintiffs' PWC were defective.

Plaintiffs have presented sufficient evidence for the Court to conclude that there exists a genuine issue of material fact as to whether the Tempo fuel lines installed in the Ruddy PWC were defective.  Furthermore, the *Tincher* Court held that "[w]hether a product is in defective condition is a question of fact ordinarily submitted for determination to the finder of fact; the question is removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue." *Tincher*, 104 A.3d at 335; *see also Nathan v. Techtronic Indus. N. Am., Inc.*, 92 F.Supp.3d 264, 269 (M.D.Pa. 2015) (noting that *Tincher* underscored the overarching principle that whether a product is in a defective condition is a question of fact to be decided by the jury (citation omitted)).

It is clear that Defendants have not met their burden in showing that there exists no genuine dispute of material fact regarding whether the fuel lines manufactured by Tempo were defective due to a manufacturing, design, or warning defects. Because Plaintiffs' negligence (Count I) and strict liability (Count II) claims rely on the issue of whether the fuel lines manufactured by Tempo were defective, the Court will deny Moving Defendants' Motion for Summary Judgment as to Counts I and II.

### 2. Punitive Damages

Moving Defendants next argue that the Court should dismiss Plaintiffs' claims for punitive damages. (Doc. 171 at 26). In Pennsylvania, punitive damages "are awarded only for outrageous conduct, that is, for acts done with a bad motive or with reckless indifference to the interests of others." *SHV Coal, Inc. v. Cont'l Grain Co.*, 526 Pa. 489, 587 A.2d 702, 705 (Pa. 1991) (quoting *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355, 358 (1963)). As the Supreme Court of Pennsylvania described,

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. Punitive damages must be based on conduct which is "malicious," "wanton," "reckless," "willful," or "oppressive." Further, one must look to the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties. The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless, or malicious. (internal citations omitted).

*Feld v. Merriam*, 506 Pa. 583, 485 A.2d 742, 747-48 (Pa. 1984).

Therefore, punitive damages "are not justified where the defendant's mental state rises to no more than gross negligence." *SHV Coal*, 587 A.2d at 705. Furthermore, to

35

succeed on a claim for punitive damages, a plaintiff must produce sufficient evidence to establish that "(1) a defendant had subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchinson v. Luddy*, 870 A.2d 766, 772 (Pa. 2005). The Third Circuit has recognized that a district court may determine punitive damage claims on summary judgment. *Vitalis v. Sun Constructors, Inc.*, 481 Fed. Appx. 718, 729 (3d Cir. 2012) (citing *Pichler v. UNITE*, 542 F.3d 380, 387 (3d Cir. 2009) ("If, on remand, the District Court determines that summary judgment is appropriate as to plaintiffs' punitive damages claim, then a trial will be unnecessary."); *Cochetti v. Desmond*, 572 F.2d 102, 103 (3d Cir. 1978) ("As to the claim for punitive damages, we conclude that on the record before the district court summary judgment was proper[.]")).

Plaintiffs cite a significant amount of caselaw to support their position, but fail to connect that caselaw to the facts of this case. (*See* Doc. 171 at 26-28). Moving Defendants make the conclusory allegation that "[p]unitive conduct is lacking in this case" without citing to the record. (*Id.* at 28). In addition, "'to justify an award of punitive damages, the fact-finder must determine that the defendant acted with a culpable state of mind, *i.e.*, with evil motive or reckless indifference to the rights of others.'" *Brand Mktg. Grp. LLC v. Intertek Testing Servs., N.A., Inc.*, 801 F.3d 347, 360 (3d Cir. 2015) (quoting *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 983-84 (Pa. Super. Ct. 2005)). Determining whether Moving Defendants acted with a culpable state of mind that gives rise

to the imposition of punitive damages is a question for the jury, not the Court. As such, Moving Defendants have failed to meet their burden to establish that there is no genuine question of material fact on the issue of punitive damages and, in any event, summary judgment is not the appropriate forum within which to address Plaintiffs' punitive damages claims. Thus, the Court will deny Moving Defendants' Motion for Summary Judgment on Plaintiffs' claim for gross negligence, recklessness, and malice (Count IV).

### 3. Breach of Warranty

Moving Defendants' final argument in their Motion is that the Court should grant summary judgment on Plaintiffs' breach of warranty claims (Doc. 69 at ¶¶ 84-86) because they "were not filed within the four-year statute of limitations required under Pennsylvania law" and "the elements of both are lacking in this case and Plaintiffs fail to state a viable claim for breach of warranty." (Doc. 171 at 28). Plaintiffs plead breach of both express and implied warranties in their breach of warranty claim, and the Court must distinguish between the express and implied warranty claims and address each separately.

### i. Breach of Express Warranty

Section 2313 explains, in relevant part:

(a) General rule. – Express warranties by the seller are created as follows:

> (1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

37

> (2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
>
> (3) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

13 Pa. C.S.A. § 2313(a). On review of the record, while Plaintiffs plead breach of an express warranty (*see* Doc. 69 at ¶¶ 83-89), they come forward with no facts raising a genuine dispute of the existence of such express warranty. Indeed, Plaintiffs' Brief in Opposition to Moving Defendants' Motion argues only that their breach of warranty claim is not time barred and does not address Moving Defendants' assertion that "Plaintiffs are unable to point to any communications evidencing an express warranty." (Doc. 169 at ¶ 52; *see also* Doc. 199 at 15 ("Plaintiffs have not even presented a warranty as part of the record.")).

Failing to establish the arguable existence of an express warranty in the face of Moving Defendants' Motion for Summary Judgment, Moving Defendants' Motion must be granted on Plaintiffs' claim for breach of express warranty.

### ii. Breach of Implied Warranties

Plaintiffs claim that Moving Defendants breached the implied warranty of merchantability and implied warranty of fitness for a particular purpose. (Doc. 69 at ¶¶ 83-89). Section 2314 explains, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." 13 Pa.

C.S.A. § 2314(a).  Similarly, Section 2315 states that "[w]here the seller at the time of

contracting has reason to know: (1) any particular purpose for which the goods are required;

and (2) that the buyer is relying on the skill or judgment of the seller to select or furnish

suitable goods; there is . . . an implied warranty that the goods shall be fit for such purpose."

13 Pa. C.S.A. § 2315.

In Pennsylvania, breach of warranty claims, such as claims for a breach of implied

warranty of merchantability or implied warranty of fitness for a particular purpose, are

governed by a four-year statute of limitations.  13 Pa. C.S.A. § 2725(a) ("An action for

breach of any contract for sale must be commenced within four years after the cause of

action has accrued").  A cause of action for breach of warranty accrues when the breach

occurs, "regardless of the aggrieved party's lack of knowledge of the breach."  13 Pa. C.S.A.

§ 2725(b).  "A breach of warranty occurs when tender of delivery is made, except that where

a warranty explicitly extends to future performance of the goods and discovery of the breach

must await the time of such performance the cause of action accrues when the breach is or

should have been discovered."  *Id.*  Finally, "the discovery rule applicable to tort claims does

not apply in warranty actions."  *Giehl v. Terex Utilities*, 2012 WL 1183719, at *10 (M.D.Pa.

April 9, 2012) (citing *Pitts v. Northern Telecom, Inc.*, 24 F.Supp.2d 437, 443 (E.D.Pa. 1998);

*see also Northampton Cnty. Area Cmty. College v. Dow Chemical, U.S.A.*, 556 A.2d 591,

599 (Pa. Sup. Ct. 1989) ("[T]he tort discovery rule does not apply to breach of warranty

actions.").

Plaintiffs allege that Moving Defendants breached the implied warranties of fitness and merchantability "in that the subject PWC and/or fuel system component parts constituted a serious danger to the user and others, was not safe for its intended or foreseeable uses, was not of merchantable quality, was not fit and safe for the ordinary purposes for which it was sold, and was not free from all defects." (Doc. 69 at ¶ 86). Plaintiffs purchased the PWC in January of 2010 from a private seller in Florida. (Doc. 69 at ¶ 26; Eugene Ruddy Dep. Tr., Doc. 170-2, Ex. B at 42:2-18). Plaintiffs' PWC exploded on July 27, 2016 and they filed the above-captioned action on March 7, 2017. (Doc. 69 at ¶¶ 3, 27; see also Doc. 1). Even if the Court assumes any implied warranties of merchantability or fitness for a particular purpose became effective upon Plaintiffs' purchase of the subject PWC in January of 2010, both implied warranties would have expired in January of 2014, years before Plaintiffs suffered their injuries from the PWC explosion in July of 2016.

Because the instant action was not initiated until 2017 and the discovery rule does not apply to breach of warranty claims, Plaintiffs' claims for breach of implied warranties of merchantability and fitness for a particular purpose are barred by the statute of limitations. See Giehl, 2012 WL 1183719, at *11. Accordingly, Moving Defendants' Motion must be granted on Plaintiffs' claims for breach of implied warranty of fitness and merchantability.

Because the Court will grant Moving Defendants' Motion for Summary Judgment on Plaintiffs' claims for breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose based on

the analysis above, the Court will grant summary judgment on Count III of Plaintiffs' Fourth Amended Complaint.

## V. CONCLUSION

For the aforementioned reasons, the Court will deny Moore's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 167).  The Court will also deny Moving Defendants' Motion for Summary Judgment (Doc. 169) as to Counts I, II, IV, V, and VI of Plaintiffs Fourth Amended Complaint, and grant Moving Defendants' Motion for Count III.  A separate Order follows.

Robert D. Mariani
United States District Judge