THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

MAR 0 3 2022

Per_____
DEPUTY CLERK

EUGENE RUDDY and REBECCA
RUDDY, husband and wife, individually
and as parents of S.R., a minor,

      Plaintiffs,

  v.

POLARIS INDUSTRIES, INC. et al.,

      Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:

3:17-CV-0423
(JUDGE MARIANI)

## MEMORANDUM OPINION

### I. INTRODUCTION

On March 7, 2017, Plaintiffs Eugene Ruddy and Rebecca Ruddy, husband and wife,
individually and as parents of S.R., a minor, filed a Complaint (Doc. 1) against multiple
defendants, including Carter Fuel Systems, Inc. and Tenneco, Inc.[1]  Collectively, Plaintiffs
assert six claims against Defendants in their Fourth Amended Complaint (Doc. 69):
negligence (Count I); strict liability (Count II); breach of warranty (Count III); gross
negligence, recklessness, malice (Count IV); loss of consortium (Count V); and negligent
infliction of emotional distress (Count VI).  Presently before the Court is a Motion for Partial
Summary Judgment (Doc. 164) filed by Carter Fuel Systems, Inc. and Tenneco, Inc.
("Moving Defendants") on Plaintiff's claims for punitive damages.  For the reasons that
follow, Moving Defendants' Motion will be denied.

---

[1] By stipulation of the parties (Doc. 193), Tenneco, Inc. has been dismissed from this case.

## II. STATEMENT OF UNDISPUTED FACTS

Moving Defendants Tenneco and Carter Fuel have submitted a Statement of Material Facts (Doc. 164) as to which they submit there is no genuine issue or dispute for trial, as well as a number of exhibits[2] attached thereto.  Plaintiffs submitted a Response to the Statement of Material Facts, along with a Counterstatement of Material Facts (Doc. 180), with the result being that the following facts have been admitted except as specifically noted.[3]

This matter arises out of an explosion that took place on July 27, 2016 involving a Polaris Model 2002 Virage i Personal Watercraft ("PWC") at Wilsonville Campground on Lake Wallenpaupack.  (Doc. 164 at ¶ 1).  Stephen Spiegelberg, Ph.D., describes the incident as follows:

> In January of 2010, the plaintiffs (Eugene and Rebecca Ruddy) purchased a personal water craft, Polaris Model 2002 Virage i (Serial number US-

---

[2] Moving Defendants' exhibits include, but are not limited to: the expert report of Stephen Spiegelberg, Ph.D.; Federal-Mogul, LLC's Answers to Plaintiff's Interrogatories; this Court's Order granting Defendants Federal-Mogul Corporation and Federal Mogul LLC's Motion for Substitution; the expert report of David B. Cooke, P.E.; and the List of Reported Breakages.  (Doc. 164, Ex. A-G).  In setting forth the statement of undisputed facts and explaining its analysis in the case, the Court has cited to, and relied upon, the contents of these indisputably authentic documents as necessary.

[3] The Court considers only the moving party's statement of undisputed facts and the non-moving party's responses thereto.  M.D. Pa. L.R. 56.1.  Separate statements of fact not directly responsive to the movant's statement of facts are not contemplated by L.R. 56.1 and need not be given any evidentiary value.  *Rau v. Allstate*, 2018 WL 6422121, at *2 (M.D. Pa. Dec. 6, 2018), *aff'd*, 793 F. App'x 84 (3d Cir. 2019).  In some instances, Plaintiffs partially admit and/or qualify their responses.  (*See* Doc. 180; Doc. 181).  In the Statement of Undisputed Facts, the Court includes only those facts which are agreed upon, unless otherwise noted.

PLE20266D202) (PWC-1).  They purchased a second Virage i at the same time (Serial number US-PLE20234D202) (PWC-2).  On July 27, 2016, Rebecca Ruddy and her son, Scott, were seated on PWC-1 at the Wilsonville Campground on Lake Wallenpaupack in Pennsylvania.  Scott was seated in front of Rebecca on PWC-1.  Rebecca pressed the ignition button, causing PWC-1 to start briefly, after which it stopped.  Rebecca pressed the ignition button again, and PWC-1 exploded, lifting both Scott and Rebecca up into the air, causing severe injuries to both.   The upper cowling of PWC-1 was separated from the lower hull during the explosion.   PWC-2 has not experienced an explosion or fire.

(Doc. 164 at ¶ 2; *see also* Spiegelberg Report, Doc. 162-3, Ex. B, at 1).[4]

Federal-Mogul Corporation entered into an Asset Purchase Agreement with Carter Fuel Systems, LLC, one of the Moving Defendants in the instant Motion, on August 1, 2013.

(Doc. 164 at ¶ 4; *see also* Federal-Mogul's Answers to Plaintiffs' Interrogatories, Doc. 164-5, Ex. D).  In response to Plaintiffs' interrogatories, Federal-Mogul, LLC explained,

Federal-Mogul Corporation sold its fuel pump product line by way of an Asset Purchase Agreement dated August 1, 2013 to Carter Fuel Systems, LLC. Pursuant to the Asset Purchase Agreement, Carter Fuel Systems, LLC, a Delaware Corporation, assumed the fuel pump product line to include information concerning the design and manufacture of any items included in the fuel pump product line.  On February 13, 2017, all existing rights, assets, debts and obligations of Federal-Mogul Corporation were vested in Federal-Mogul LLC as a result of an entity conversion.  Thereafter, on October 1, 2018, all existing rights, assets, debts and obligations of Federal Mogul LLC were vested in Tenneco Inc. as a result of the Merger.

(Doc. 164 at ¶ 4).[5]

---

[4] Moving Defendants state that the fuel pump in Plaintiffs' PWC was manufactured by Federal Mogul. (Doc. 164 at ¶ 3).  Plaintiffs deny this statement, explaining that "[t]he subject fuel pump has the name Carter stamped on it."  (Doc. 180 at 19).

[5] Plaintiffs deny this statement as stated, saying that "[i]t is admitted that an APA was entered into on August 1, 2013. The APA is a document that speaks for itself."  (Doc. 180 at 19). Plaintiffs directed the

Federal-Mogul Corporation and Federal-Mogul LLC were defendants in the above-captioned matter until April 16, 2019 when this Court granted Federal-Mogul Corporation and Federal-Mogul LLC's Motion for Substitution of Parties.  (Doc. 164 at ¶ 5; *see also* Doc. 164-6, Ex. E at 3).  The Order substituted Moving Defendant Tenneco, as successor in interest to Federal-Mogul Corporation and Federal-Mogul, LLC, for Federal-Mogul Corporation and Federal-Mogul LLC.  (Doc. 164 at ¶ 6).

Count IV of Plaintiffs' Fourth Amended Complaint, which is the operative Complaint in this matter, asserts a claim for "Gross Negligence, Recklessness, Malice" and seeks punitive damages against all Defendants, including Moving Defendants Tenneco Inc. and Carter Fuel Systems Inc.  (*Id.* at ¶¶ 7-8; *see also* Fourth Amended Complaint, Doc. 69 at ¶¶ 90-96).

Plaintiffs have produced six expert reports, including expert reports from Stephen Spiegelberg, Ph.D., and David B. Cooke, P.E. (Doc. 164-3, Ex. B; Cooke's Report, Doc. 164-7, Ex. F).  Dr. Spiegelberg provides the following conclusions in his report:

- the fuel lines shrank due to prolonged exposure to heat and age;
- the return and send fuel barb partially fractured before the explosion; and
- the shrinking and twisting fuel lines, coupled with fuel barbs that lost their mechanical integrity, caused fuel or fuel vapors to escape into the engine compartment causing an explosion.

---

Court to their "Counterstatement of Facts and/or accompanying memorandum of law," where they summarized the same information that is in Moving Defendants' statement of facts.  (Doc. 181 at 6, n. 2).

(Doc. 164 at ¶ 10; *see also* Doc. 164-3, Ex. B at 1).  At the end of his report, Dr.

Spiegelberg gave a more detailed summary of his findings:

> Given at least 24 known fuel barb breaks between Polaris and Federal
> Mogul/Carter, the conduct in this case goes beyond negligence.  In fact,
> Chrysler also reported fuel barb breaks that were not part of this list; thus, the
> number of breaks is even greater (Wagner deposition, p. 149).  Allowing this
> product to remain in the stream of commerce without warning, recall or
> modification demonstrates a reckless disregard for human life and safety.
>
> The failure to perform an investigation after this volume of failures
> demonstrates a reckless and conscious disregard for the safety of PWC users
> including the Ruddy family.  The testimony demonstrates that Polaris and the
> fuel barb component manufacturers were aware of the catastrophic risk
> presented by fuel exposure in the engine compartment.  Ignoring this long
> history of fuel barb breaks is unconscionable.

(Doc. 164 at ¶ 11; *see also* Doc. 164-3, Ex. B at 10).

> In a similar fashion, Mr. Cooke concluded that:

> The incident PWC exploded due to: (1) shrinking fuel lines; (2) defective plastic
> fuel barbs, which failed and separated, exposing the engine compartment to
> fuel; (3) improper maintenance instructions which allowed fuel lines and plastic
> fuel barbs to remain in use indefinitely without periodic replacement; (4)
> improper ventilation; and (5) improper fuel warning labels.

(Doc. 164 at ¶ 12; *see also* Doc. 164-7, Ex. F at 1).  Mr. Cooke also determined that:

> Given the numerous documented fuel barb breakages known to both Carter
> Fuel/Federal Mogul and Polaris, the conduct in this case was shocking,
> outrageous and demonstrated a reckless disregard for human life and safety.
> Carter Fuel/Federal Mogul and Polaris disregarded a known risk of danger to
> PWC users as all were aware of the frailty of the fuel barbs and the danger they
> posed if they broke.  The conduct was outrageous, callous and beyond mere
> negligence.  The conduct was indeed reckless.

(Doc. 164 at ¶ 13; *see also* Doc. 164-7, Ex. F at 18).

Steven Wagner, the corporate designee of the Moving Defendants, provided the following testimony regarding the multiple fuel barb breaks referenced by Plaintiffs' experts that Moving Defendants' had knowledge of prior to the explosion of Plaintiffs' PWC:

**Q**. --you were able to glean that at least some of these 24 incidents of broken fuel barbs occurred within Polaris presumably while they were manufacturing PWC; is that correct?

...

**A**. The – I mean I'm looking at a document that was – I didn't perform the analysis.  I'm looking at the format –

**Q**. Uh-hmm.

**A**. -and the way they did this back then, and based on the descriptors here – that are in here, the document to me reflects as in past practice that would say that because of the Fault Column there where fault was assigned, yes.  When the analysis was done, we did assign the fault to the customer.

**Q**. Meaning Polaris?

**A**. Meaning Polaris.

...

**Q**. With regard to any of those 24, reading those, just what's on the – on the table, were you able to identify any of those incidents that occurred after a PWC left Polaris, went to an actual user of the PWC who took it out onto the water?

**A**. I don't recall having that –

**Q**. You can take a look again if you need to.

**A**. Yeah.

**Q**.  And that's probably gonna be my last question.

**A**. Sure. (Reviewing.)  There is some time on here captured, like, 4 hours, and I can't read the fine print – 20 hours, I think.  There's a couple of them – there's like no hours or – in the Mileage Column – okay? – there's a lot of blanks.

**Q**. Um-hmm.

**A**. Okay?  If these hadn't had time on them, that would be blank or they would put a zero in there.  Okay?

So there are two of these that actually have – one says 20 hours and one says 4 hours, so that would tell me that that was in operation for that period of time. …

**Q**. Okay.  So if I understand you correctly, there might have been two of the 24 that occurred after the part was actually in service?

**A**. Yeah.

(Doc. 164 at ¶ 15; *see also* Wager Dep. Tr., Doc. 164-4, Ex. C at 308:14-311:10).[6]

## III.  STANDARD OF REVIEW

Summary judgment is appropriate "only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008).  "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*,

---

[6] Plaintiffs admitted in part and denied in part this excerpt from Moving Defendants' Statement of Facts. (Doc. 180 at ¶ 15).  Specifically, Plaintiffs admit that "Polaris and Carter/Federal Mogul were aware of multiple fuel barb breaks prior to the subject explosion," but they do not explain their disagreement with this statement. (*Id.*).  Therefore, the Court included the full excerpt from Mr. Wagner's deposition transcript that Moving Defendants included in their Statement of Facts because the authenticity of the deposition transcript cannot reasonably be disputed.

477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW,*

8

*Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## IV. ANALYSIS

In the Fourth Amended Complaint, Plaintiffs Rebecca Ruddy and S.R. assert a claim of "Gross Negligence, Recklessness, Malice" against all Defendants, including Moving Defendants Carter Fuel Systems, Inc. and Tenneco Inc., and seeks compensatory and punitive damages, together with lawful interests and costs of the suit. (Doc. 69 at ¶¶ 90-96).

9

Moving Defendants move for partial summary judgment on the issue of punitive damages and argue that the "record is completely devoid of any evidence from which a jury ... could possibly conclude that Moving Defendants acted in conscious disregard or indifference to the risk, and certainly there could be no finding of malice." (Doc. 164 at 15). Moving Defendants argue that "there is a clear distinction" between the fuel barb breakages of which they had knowledge and the fuel barb breakage that allegedly contributed to Plaintiffs' PWC explosion and, as such, they did not subjectively appreciate the risk of harm of a fuel barb breakage in a PWC. (*Id.* at 18). Moving Defendants also contend that the reports submitted by two of Plaintiffs' experts, Stephen Spiegelberg, Ph.D., and David B. Cooke, contain improper legal conclusions and should be disregarded by this Court. (*Id.* at 13; Supplemental Brief in Support of Motion for Partial Summary Judgment, Doc. 200 at 6).

In response, Plaintiffs argue that the evidence shows "actual knowledge by Moving Defendants that the fuel barbs were breaking at alarming rates" and that "fuel would be exposed in the hull of a PWC when a fuel barb broke thereby creating a hazard of catastrophic injury." (Doc. 181 at 17). Plaintiffs allege that "Moving Defendants, in conscious disregard of the risk to the consumers, including the Ruddy family, failed to undertake any risk analysis or Failure Mode Effect Analysis ("FMEA") of the hazard" or other post-production testing despite knowledge of the fuel barb breakages. (*Id.*).

In Pennsylvania, punitive damages "are awarded only for outrageous conduct, that is, for acts done with a bad motive or with reckless indifference to the interests of others."

*SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 705 (Pa. 1991) (quoting *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355, 358 (1963)).  As the Supreme Court of Pennsylvania described,

> Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. Punitive damages must be based on conduct which is "malicious," "wanton," "reckless," "willful," or "oppressive."  Further, one must look to the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties.  The state of mind of the actor is vital.  The act, or the failure to act, must be intentional, reckless, or malicious.  (internal citations omitted).

*Feld v. Merriam*, 506 Pa. 583, 485 A.2d 742, 747-48 (Pa. 1984); *see also Brand Mktg Grp. LLC v. Intertek Testing Servs., N.A., inc.*, 801 F.3d 347, 360 (3d Cir. 2015) ("'[T]o justify an award of punitive damages, the fact-finder must determine that the defendant acted with a culpable state of mind, *i.e.*, with evil motive or reckless indifference to the rights of others.'" (quoting *Hutchinson v. Penske Truck Leasing Co.*, 876 A.2d 978, 983-84 (Pa. Super. Ct. 2005)).  Therefore, punitive damages "are not justified where the defendant's mental state rises to no more than gross negligence."  *SHV Coal*, 587 A.2d at 705.

To succeed on a claim for punitive damages, a plaintiff must produce sufficient evidence to establish that "(1) a defendant had subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk."  *Hutchinson v. Luddy*, 870 A.2d 766, 772 (Pa. 2005).  The Third Circuit has recognized that a district court may determine punitive damage claims on summary judgment.  *Vitalis v. Sun Constructors, Inc.*, 481 Fed. Appx. 718, 729 (3d Cir.

2012) (citing *Pichler v. UNITE*, 542 F.3d 380, 387 (3d Cir. 2009) ("If, on remand, the District Court determines that summary judgment is appropriate as to plaintiffs' punitive damages claim, then a trial will be unnecessary."); *Cochetti v. Desmond*, 572 F.2d 102, 103 (3d Cir. 1978) ("As to the claim for punitive damages, we conclude that on the record before the district court summary judgment was proper[.]")).  However, "[t]he determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court so long as that discretion has not been abused." *SHV Coal*, 587 A.2d at 705.

Both parties center a significant part of their arguments on the List of Reported Breakages (Doc. 164-8, Ex. G), which documents 24 fuel barb breakages reported to Moving Defendants.[7]  Moving Defendants argue that, because fault was attributed to Polaris for 22 of the 24 breakages on the List of Reported Breakages, as opposed to a customer or end user of a PWC, "there is a clear distinction" between the breakages caused by Polaris and the breakage that allegedly caused the Plaintiffs' PWC to explode.  (Doc. 164 at 17-18). Moving Defendants argue that it is an "undisputed fact of record that virtually all of the aforementioned fuel barb breakages occurred during the PWC manufacturing process at Polaris, as opposed to breakages that occurred after leaving the factory."  (*Id.* at 11).

---

[7] The List of Reported Breakages documents 26 instances of damage to the fuel pump module assembly in PWCs.  Twenty-four of these reports involved a breakage or other damage to the fuel tubes and barbs, and fault was attributed to Polaris for 22 of the 24 broken fuel barbs on the List.  Fault was attributed to the end user or customer for the remaining two fuel barb breakages. (Wagner Dep., Doc. 180-10, Ex. H at 59-62).

Accordingly, Moving Defendants allege that the Polaris breakages could not give them a subjective appreciation of the risk of harm from a fuel barb breakage in a customer's or end user's PWC "given the important difference between the prior breakages during manufacture, and the alleged breakage that occurred in the subject accident." (*Id.* at 18).

In response, Plaintiffs argue that "Federal Mogul/Carter received complaints of fuel barbs breaking from end users and Polaris," which were documented on the List of Reported Breakages, and they "were on notice of dozens of fuel barb breaks prior to the explosion at issue in this case." (Doc. 181 at 20-21). Plaintiffs cite the deposition transcription of Mr. Wagner in support of their argument because he agreed that "Federal-Mogul was aware that fuel barbs had broken on the fitting module prior to the manufacture of the Polaris 2002 Virage i" and that "Federal-Mogul was on notice of at least 26 instances in which the fuel tube and fuel barb on the fitting module broke on the fuel pump module used in the Ruddy PWC." (Doc. 181 at 21; *see also* Doc. 180-10, Ex. H, Wagner Dep, at 22, 58). Plaintiffs argue that knowledge of the breakages on the List of Reported Breakages gave Moving Defendants a subjective appreciation of the risks associated with a fuel barb breakage in a PWC and the continued use of the fuel barbs without additional testing or warnings constitutes a "conscious disregard for consumer safety." (Doc. 181 at 21, 25).

In addition to the documented fuel barb breakages on the List of Reported Breakages, there are a series of undocumented fuel barb breakages that occurred in

Chrysler automobiles[8] of which Moving Defendants were aware. (Wagner Dep., Doc. 180-10, Ex. H at 38-39). Mr. Wagner testified that Chrysler service technicians called to report breakages, which allegedly occurred "when they pull the tubes – when they pull the hose to lift the part, the most susceptible point or weakest point would be the tube if they exceed a certain amount of pressure in pulling up on the tube" and "when [service technicians] take them out of the vehicle or in a hurry and they just pull up on the – the hoses to lift them out of the tanks, and that's when they broke the tubes." (*Id.* at 38).

Moving Defendants do not directly address the fuel barb breakages that occurred in Chrysler automobiles in their Motion for Partial Summary Judgment or Supplemental Brief in Support of their Motion. Instead, Moving Defendants rely on the argument that "there is a clear distinction between the prior breakages referenced by Plaintiff's experts and the

---

[8] Polaris PWCs, like the one Plaintiffs owned, and Chrysler automobiles used the same fitting module and a very similar fuel pump module assembly system. During his deposition, Mr. Wagner compared the fuel pump module assembly in PWCs and in Chrysler automobiles:

> **Q**. Okay. So the fuel pump module assembly is very similar in appearance, but the fitting module is identical [in Chrysler automobiles and PWCs]?
> **A**. Yes.
> **Q**. What would be the difference between the fuel module assembly used in a PWC and one used in a Chrysler car?
> **A**. I don't know off the top of my head. It could be something like a – the internal pump could be a little different, different flow rates or just some minor components here and there.
> **Q**. But you're sure that the fitting module that is identified here in the fuel pump module assembly is used in both PWC applications and in Chrysler vehicle –
> **A**. No longer –
> **Q**. Chrysler vehicles?
> **A**. -but, yes, at this period of time, we use that on Chrysler. We have a lot of applications.

(Wagner Dep., Doc. 180-10 Ex. H, at 17).

14

alleged break/fracture that is alleged to have played a role in the subject accident." (Doc. 164 at 18; *see also* Doc. 200 at 6 ("It is clear and beyond any question of material fact that Plaintiffs have not produced any record that could possibly support a claim for punitive damages against Carter Fuel Systems, Inc.")).

The record demonstrates Moving Defendants had knowledge of at least 24 documented fuel barb breakages in PWCs and a series of undocumented breakages in Chrysler automobiles prior to the explosion of Plaintiffs' PWC caused, in part, by a broken fuel barb. Although Moving Defendants argue these breakages could not have given them a subjective appreciation of the risk of harm of a fuel barb breakage in a PWC, they fail to sufficiently explain how or why the Polaris and Chrysler breakages are so different from the breakage that occurred in Plaintiffs' PWC such that they would not give them the requisite subjective appreciation of the risk. Moving Defendants' argument that it is "clear" that the Polaris and Chrysler fuel barb breakages are "distinct" from the breakage in Plaintiffs' PWC is not persuasive, and thus, insufficient to satisfy their burden of establishing the lack of a genuine factual dispute.

This is especially true when viewed in conjunction with the expert reports from two of Plaintiffs' experts, Stephen Spiegelberg, Ph.D., and David B. Cooke, P.E. Moving Defendants and Plaintiffs both cite to the same portions of Dr. Spiegelberg's and Mr. Cooke's reports, albeit to support opposing propositions. Moving Defendants argue that the experts' reports advance "certain legal conclusions thinly veiled as expert conclusions" that

the Court should not consider in its analysis, while Plaintiffs argue that the reports support

their claim for punitive damages.  (*See* Doc. 164 at 4-5, 15; Doc. 181 at 24-25).  The first

excerpt the parties cite is from Dr. Spiegelberg's report in which he explains:

> Given at least 24 known fuel barb breaks between Polaris and Federal Mogul/Carter, the conduct in this case goes beyond negligence.  In fact, Chrysler also reported fuel barb breaks that were not part of this list; thus, the number of breaks is even greater.  Allowing this product to remain in the stream of commerce without a warning, recall or modification demonstrates a reckless disregard for human life and safety.
>
> The failure to perform an investigation after this volume of failures demonstrates a reckless and conscious disregard for the safety of PWC users including the Ruddy family.  The testimony demonstrates that Polaris and the fuel barb component manufacturers were aware of the catastrophic risk presented by fuel barb exposure in the engine compartment.  Ignoring this long history of fuel barb breaks is unconscionable.

(Doc. 164-3, Ex. B at 1; *see also* Doc. 164 at 4; Doc. 181 at 24-25).  The parties also cite

Mr. Cooke's report in which he similarly concludes:

> Given the numerous documented fuel barb breakages known to both Carter Fuel/Federal Mogul and Polaris, the conduct in this case was shocking, outrageous and demonstrated a reckless disregard for human life and safety. Carter Fuel/Federal Mogul were aware of the frailty of the fuel barbs and the danger they posed if they broke.  The conduct was outrageous, callous and beyond mere negligence.  The conduct was, indeed, reckless.

(Doc. 164-7, Ex. F at 18; *see also* Doc. 164 at 5; Doc. 181 at 25).

Expert opinions must be "based on sufficient facts or data" to be valid, and an expert

cannot testify to the governing law of the case." *Burger v. Showtime Motor Sports, Inc.*,

2012 WL 263683, at *5 (M.D.Pa. January 30, 2012) (citing Fed. R. Evid. 702; *Berckeley Inv.*

*Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006)).  "Although Federal Rule of Evidence

704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact,' an expert witness is prohibited from rendering a legal opinion." *Id.* (quoting Fed. R. Evid. 704); *see also Berckeley Inv. Grp, Ltd.*, 455 F.3d at 217; *Blain v. Twp. Of Radnor*, 167 Fed. Appx. 330, 338 (3d Cir. 2006) ("[T]he expert's opinion contained the same legal argument advanced in Blain's opposition to the motion for summary judgment. The expert's opinion creates no more a genuine issue of material fact than does Blain's opposition to the motion.").

Moving Defendants allege that "both Dr. Spiegelberg and Mr. Cooke step well outside their areas of expertise and form legal conclusions with regard to the design of the fuel barbs," urging the Court to disregard their reports in its analysis. (Doc. 164 at 16). Moving Defendants argue that Dr. Spiegelberg and Mr. Cooke base their opinions on "irrelevant" evidence of the fuel barb breakages attributed to Polaris. (*Id.* at 12 ("Not only are breakage[s] that occurred during manufacture of the PWC's at Polaris irrelevant to the facts of this accident, as alleged and averred by Plaintiffs, moreover they are inapposite to the improper legal conclusions of Plaintiffs experts that such breakages presented a known hazard to end users.") (internal citations omitted)).

The Court finds that Plaintiffs permissibly relied on the expert reports of Dr. Spiegelberg and Mr. Cooke in support of their claim for punitive damages. *See Perez v. Great Wolf Lodge of the Poconos LLC*, 200 F. Supp.3d 471, 484 (M.D.Pa. 2016) (denying the defendants' motion for summary judgment on the punitive damages claim based on the

plaintiffs' expert report, which stated that "Defendants conduct was 'the most wanton disregard for the safety of patrons I have ever encountered in my 30 years of investigating accidents'"); *Ely v. Cabot Oil & Gas Corp.*, 2014 WL 7508091, at \*16 (M.D.Pa. Apr. 21, 2014) (denying the defendants' motion for summary judgment based, in part, on the plaintiffs' expert report stating "the evidence of negligence and causation on the part of the gas company and its drilling operators is, frankly, overwhelming and irrefutable")). Moving Defendants provide the Court with little more than conclusory statements as to Dr. Spiegelberg's and Mr. Cooke's qualifications and fail to provide an analysis to support the statement that they "step well outside their areas of expertise." (*See* Doc. 164 at 16). In the absence of such analysis, the Court rejects Moving Defendants' request that the Court disregard Dr. Spiegelberg's and Mr. Cooke's reports.

Particularly of note, Mr. Cooke determined that "the fuel barbs [in the Plaintiffs' PWC] had a design defect and were not manufactured to withstand the tensional and torsional forces and stresses of routine PWC activity." (Doc. 164-7, Ex. F at 13). Mr. Cooke came to this conclusion after testing how much force an "exemplar fuel pump return line fuel barb" could endure and found that it "could not withstand Federal Mogul/Carter Fuel's own standard of 44.96 pounds of force in any direction." (*Id.*). Dr. Spiegelberg conducted the same test and received the same results, and he also concluded that there was a problem with the ability of the fuel tubes and barbs to withstand pulling, tension, and twisting forces in a PWC. (Doc. 164-3, Ex. B at 9 ("The linear fuel line shrinkage would pull the fuel tank

18

towards the engine, causing it to pivot upwards around the fuel tank stay, putting tensile stress on the fuel barbs.  Coupled with the twisting action incurred by the fuel lines as the fuel lines shrank, the send and return hose barbs eventually cracked under the tension/twisting load[.]")).  Dr. Spiegelberg and Mr. Cooke determined that these "tensional and torsional forces" that caused breakages in their lab tests also contributed to the cause of the explosion of Plaintiffs' PWC.  (*See* Doc. 164-3 at 6 ("Both the send and return hose barbs [in Plaintiffs' PWC] show evidence of torsional (twisting) failure, in combination with tensile (pulling) loading, indicating the hose barb fractured by a combination of twisting and pulling."); Doc. 164-7, Ex. F at 5 ("The fuel barbs on the fuel pump were broken by excessive tension and torque.")).

The record shows that issues with pulling and twisting on the fuel tubes and barbs were not limited to the tests conducted by Plaintiffs' experts or Plaintiffs' PWC.  In fact, Mr. Wagner testified that both the Polaris and Chrysler breakages were caused by "mishandling of the modules," "pulling on the tubes and breaking the tubes by exerting excessive force," and service technicians "tak[ing] them out of the vehicle or in a hurry and they just pull up on the – the hoses to lift them out of the tanks."  (Wagner Dep., Doc. 180-10, Ex. H at 38, 63).  When Mr. Wagner's testimony is considered alongside Dr. Spiegelberg's and Mr. Cooke's opinions regarding on the impact of tensional and torsional forces on the fuel barbs in PWCs, and drawing all inferences in favor of Plaintiffs, it is clear that issues of material fact exist regarding whether Moving Defendants subjectively appreciated the risk of harm of a

fuel barb breakage (and, more specifically, a breakage caused by tensile or torsional forces) in a PWC.

Furthermore, the Court does not agree with Moving Defendants that Dr. Spiegelberg and Mr. Cooke based their opinions on "irrelevant" evidence because, as discussed above, it cannot be said that the Polaris breakages are irrelevant to the instant action.  A genuine issue of fact remains as to whether the Polaris breakages made Moving Defendants subjectively appreciate the risk of harm of a fuel barb breakage in a PWC.  *See Walker v. Gordon*, 691 695-96 (3d Cir. 2002) ("An expert is, nonetheless, permitted to base his opinion on a particular version of disputed facts and the weight to be accorded to that particular opinion is for the jury.") (citing *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002)).  Disputed facts, and expert opinions derived from such facts, are issues reserved for the jury at trial, at which time Moving Defendants may cross-examine Dr. Spiegelberg and Mr. Cooke to scrutinize their dependence on the Polaris breakages to form their opinions.  *See id.*  ("Again, factual disputes are for the jury, and Walker was perfectly free to explore on cross examination the reliance placed by Dr. Toborowsky on the disputed facts and to argue that, if it rejected the underlying factual premises of his report, it should also reject Dr. Toborowsky's expert opinion on Walker's mental state.").

Accordingly, there exists a genuine dispute of fact over whether the previous instances of fuel barb breakages – whether they were reported by Polaris, Chrysler automobile service technicians, end users, or otherwise – were sufficient to cause Moving

20

Defendants to subjectively appreciate the risk of harm from a fuel barb breakage or damage in a PWC.

The next element Plaintiffs are required to prove for punitive damages is that Moving Defendants "acted, or failed to act, as the case may be, in conscious disregard of that risk." *Calhoun*, 2014 WL 3428876 at *2. Moving Defendants argue that "the record is completely devoid of any evidence from which a jury ... could possibly conclude that Moving Defendants acted in conscious disregard or indifference to the risk, and certainly there could be no finding of malice." (Doc. 164 at 15). They contend that "any claim that Moving Defendants disregarded a known risk of danger to PWC users is completely improper given the important difference between the prior breakages during manufacture, and the alleged breakage that occurred in the subject accident." (*Id.* at 18).

The Court disagrees. The record shows that Moving Defendants did not conduct Design FMEA testing, thermal age testing beyond a seven-year timespan, or include warnings to PWC users regarding brittle or broken fuel barbs after they knew about the Polaris and Chrysler fuel barb breakages. (Wagner Dep., Doc. 180-10, Ex. H at 18-19, 54-56, 67). Dr. Spiegelberg and Mr. Cooke both noted the lack of testing or analysis conducted by Federal-Mogul/Carter after receiving multiple reports of fuel barb breakages. (Doc. 164-3, Ex. B at 8, 10; Doc. 164-7, Ex. F at 16). For example, Mr. Cooke stated, "Polaris, Federal Mogul/Carter, and Tempo failed to provide adequate warnings and instructions to the buyers and operators of the PWC with respect to the explosion hazard relative to the fuel,

21

system including the need for ... checking the brittle barbs and shrinking fuel lines for routine and mandatory replacement." (Doc. 164-7, Ex. F at 16). Additionally, Plaintiffs argue that "Federal Mogul failed to perform thermal aging testing and had no idea how long the fuel barbs could withstand a PWC environment despite admitting that breakage of the barbs could cause catastrophic injury," and "despite knowledge of dozens of breaks, Carter/Federal Mogul, performed no root cause/FMEA analysis or assessment to determine the cause of the breaks." (Doc. 181 at 13-14).

Plaintiffs again rely on Mr. Wagner's deposition testimony in support of their argument that Moving Defendants acted in conscious disregard of the known risk of fuel barb breakages in PWCs. Mr. Wagner testified that he was only aware of thermal aging testing on the fuel pump module assembly for a span of seven years and that he did not know how long the fuel pump barbs could be "exposed to a normal PWC environment in terms of heat and time before losing their mechanical property," nor did he know how many cycles fuel barbs are exposed to during one hour of typical PWC usage. (Doc. 180-10 at 55-56). Additionally, Mr. Wagner testified that "Federal-Mogul did not perform Design FMEA analysis after being informed of the broken fuel barbs" on the List of Reported Breakages. (Wagner Dep., Doc. 180-10, Ex. H at 67).

A reasonable jury could conclude that Moving Defendants' failure to conduct additional testing or include warnings on the Polaris Virage i PWC was a conscious disregard of the risk of fuel barb explosions in PWCs. In addition, witness credibility is an

22

issue for the jury to decide, not the Court.  *See Tincher v. Omega Flex, Inc.*, 104 A.2d 328,

408 (Pa. 2014) ("The credibility of witnesses and testimony offered, the weight of evidence

relevant to the risk-utility calculus, and whether a party has met the burden to prove the

elements of the strict liability cause of action are issues for the finder of fact[.]").  Therefore,

a genuine dispute of fact remains as to whether Moving Defendants acted, or failed to act,

in conscious disregard of the risk of a fuel barb breakage in a PWC.

Because a genuine dispute of material fact exists with respect to both elements of

punitive damages, summary judgment is not appropriate.  Accordingly, Moving Defendants

Motion for Partial Summary Judgment will be denied.

### V. CONCLUSION

For the reasons set forth above, Moving Defendants' Motion for Partial Summary

Judgment (Doc. 164) will be denied.  A separate Order follows.

Robert D. Mariani
United States District Judge